JUDGE CROTTY

14 CV 3527

Russell Bogart (RB 0320)
Hoffman Polland & Furman PLLC
*Attorneys for Plaintiff*
220 East 42nd Street, Suite 435
New York, New York 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

TARUN KSHETRAPAL,

                                    Plaintiff,

          -against-

DISH NETWORK, LLC, VIKAS ARORA
and IZABELA SLOWIKOWSKA,

                                    Defendants.
-----------------------------------------------------------x

RECEIVED

MAY 16 2014

U.S.D.C. S.D.N.Y.
CASHIERS

Case No.:

COMPLAINT

**(WITH JURY DEMAND)**

          Plaintiff Tarun Kshetrapal ("Plaintiff"), by and through his attorneys, Hoffman, Polland

& Furman, PLLC, hereby brings this Complaint against Defendant Dish Network, LLC

("DISH"), Izabella Slowikowska, a Director of Programming for DISH, and Vikas Arora, the

former Manager of International Programming for DISH (collectively "Defendants"), pursuant

to, *inter alia*, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,

(15 U.S.C. §78u-6, hereinafter "Dodd-Frank") and pursuant to Section 806 of the Corporate and

Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002,

18 U.S.C.A. §1514A ("SOX").

## PRELIMINARY STATEMENT

          1.          This action arises out of the bribery of DISH's International Marketing and

Programming Department employees by a marketing vendor and by programmers.  Executives in

DISH's International Marketing and Programming Department accepted bribes consisting of a

brand new Mercedes Benz, expensive Rolex watches, thousands of dollars to gamble with at Atlantic City, spa treatments, tickets to Broadway shows, limousine rides, airline tickets, luxury hotel accommodations and discounted gift cards. In exchange for such gratuities, DISH executives approved fraudulent invoices, awarded a vendor an exclusive marketing agency and approved the broadcasting of international channels on DISH's satellite.

2. Mr. Kshetrapal extensively reported the fraudulent invoicing, and other wrongdoing to: (i) his supervisors, including Ms. Slowikowska; (ii) then to DISH's Corporate Compliance Department; and (iii) subsequently to DISH's lawyers to aid their prosecution of fraud claims against the marketing agency, Aman Entertainment, Inc. d/b/a Dreamakers ("Dreamakers" or the "Vendor"). Mr. Kshetrapal chronicled Ms. Slowikowska's complicity with the Vendor, including her encouraging of him to accept a $100,000 cash bribe from the Vendor, to DISH's Corporate Compliance Department and to DISH's outside counsel. Plaintiff also disclosed that Ms. Slowikowska had obstructed his internal reporting of the fraudulent invoicing scheme by misrepresenting that the Vendor had performed certain on-line marketing activities that she knew the Vendor had not performed in accordance with its contractual obligations with DISH. Further, Plaintiff disclosed that Ms. Slowikowska had directed him to fabricate reports to cover-up for the Vendor's refusal to submit documentation establishing that the marketing activities were properly performed.

3. In retaliation for the Plaintiff's whistle-blowing activities, Ms. Slowikowska has spearheaded a campaign by the Defendants to blacklist him by defaming him throughout the industry, causing a company to rescind an offer to him to serve as head of its United States operations and by telling his current employer that DISH will not conduct business with it while Mr. Kshetrapal was employed there.

2

4.     On March 3, 2014, the United States Department of Labor ("DOL"), acting through a Regional Administrator of the Occupational Safety and Health Administration, found that reasonable cause existed to believe that the Defendants blacklisted the Plaintiff in violation of SOX ("DOL Findings"). [1] The DOL characterized as "frivolous" the Defendants' claim that Plaintiff did not engage in protected activity by reporting the Vendor's fraud scheme as DISH's fraud claims against the Vendor mimicked the Plaintiff's "initial report of improper invoicing" (DOL Findings, p. 10). Further, the DOL recognized that there is "no question" that at least three incidents of blacklisting occurred (DOL Findings, p. 11). Lastly, the DOL concluded that the Plaintiff's protected activity motivated the blacklisting because "Ms. Slowikowska was involved in the fraud" and harbored animus towards the Plaintiff for engaging in the protected activity (DOL Findings, p. 11).

5.     Accordingly, as expanded upon below, the Plaintiff seeks relief against the Defendants for retaliating against him in violation of SOX and Dodd-Frank. Additionally, Plaintiff brings common law claims against the Defendants for tortious interference with contract, tortious interference with prospective economic advantage and defamation.

## PARTIES

6.     Plaintiff Kshetrapal served as the Associate Director of South Asian Marketing for Dish Network, LLC ("Dish") from March 2007 through November 2008. From January 19, 2009 until the present, Plaintiff has been employed as a Senior Vice President of South Asian Marketing, Media and Partnerships for SAAVN, LLC (which is an acronym for the South Asian Audio Visual Network). Plaintiff is a citizen of the United States, resides in the state of New Jersey and works in Manhattan, New York.

---

[1]   Attached hereto as Exhibit A is a copy of the DOL Findings.

3

7.    DISH is a Colorado corporation with its principal place of business located in Englewood, Colorado.  Defendant DISH was formerly known as Echostar Satellite d/b/a DISH Network.  DISH is a company within the meaning of 18 U.S.C. §1514A because it is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78o(d)).  Upon information and belief, DISH reported total revenue exceeding $14 billion for 2012.

8.    Upon information and belief, Defendant Izabella Slowikowska resides in Colorado.  From 2007-2010, Ms. Slowikowska served as a General Manager of Programming for DISH's International Department.  In 2010, Ms. Slowikowska was promoted to the position of Director of International Programming.  From 2001 through 2007, Ms. Slowikowska worked in DISH's International Department as a Marketing Coordinator, then as a Marketing Specialist and ultimately as a Marketing Manager.

9.    Upon information and belief, Defendant Vikas Arora resides in Colorado.  Mr. Arora worked for DISH as a Marketing Coordinator from July 2008 through August 2009, then as a Marketing Specialist from August 2009 through September 2010 and then as a Manager of International Content from September 2010 through January 2012.  Mr. Arora left DISH shortly after Plaintiff filed a Complaint with the DOL alleging that the Defendants retaliated against him in violation of SOX.  A January 2, 2013 article published by Bloomberg Businessweek, titled "DISH Network, the Meanest Company in America," purported to rely on statements from Mr. Arora to describe a "culture of condescension and distrust" at DISH.

4

## JURISDICTION AND VENUE

10.     Jurisdiction of this Court over Plaintiffs' claims is invoked pursuant to 15 U.S.C. §78u-6(h)(1)(B)(i) and 28 U.S.C. §1331.

11.     Venue is proper within this district pursuant to 28 U.S.C.§1391(b) in that "a substantial part of the events or omissions giving rise to the claim occurred" within this judicial district.

12.     On August 11, 2011, Plaintiff filed a complaint with the DOL accusing the Defendants of blacklisting him in violation of SOX.  On or about April 2, 2014, the Defendants filed objections to the DOL Findings and requested a hearing before an Administrative Law Judge.  Pursuant to 29 C.F.R. 1980.114, Plaintiff has the right to bring his SOX claim in federal court as more than 180 days have passed since Plaintiff first filed his complaint with the DOL.

## STATEMENT OF FACTS

### A.     DISH'S INTERNATIONAL MARKETING AND PROGRAMMING DEPARTMENT

13.     DISH Network provides satellite television and entertainment to commercial and residential customers in the United States.  DISH is the largest pay provider of international television channels in the United States.  DISH presently broadcasts about 260 ethnic or international channels.

14.     About one third of the international channels broadcast by DISH consist of South Asian or Bollywood content.  DISH advertises that it "offers the most comprehensive South Asian TV packages" of any platform.  DISH has significantly more subscribers of Bollywood entertainment channels than any other satellite or cable company in the United States. Approximately 90% of the Bollywood channels available in the United States are broadcast on DISH.

15.     South Asian entertainment channels are heavily dependent upon DISH for subscription revenue. Programmers of channels broadcast on DISH earn significant revenues from DISH based on DISH's high number of subscribers. Further, South Asian advertisers pay large amounts of money to Bollywood channels broadcast on DISH. DISH also spends millions of dollars each year advertising the Bollywood content it offers to subscribers.

16.     Mr. Kshetrapal's job responsibilities at DISH consisted of marketing the South Asian television channels broadcast on DISH. The South Asian Services department was comprised of nine language groups.

17.     Plaintiff reported directly to Tracy Thompson West, the Vice President for International Marketing and Programming. Ms. Slowikowska also reported directly to Ms. West. Based on his market expertise, Mr. Kshetrapal directly worked with Ms. Slowikowska on issues such as whether channels were breaching the terms of their contracts with DISH, whether new channels should be launched and how channels should be packaged. Ms. Slowikowska also approved marketing plans for the South Asian business.

18.     According to an EchoStar Succession Planning memorandum maintained in the Plaintiff's official personnel file, DISH promoted Plaintiff to the position of "Associate Director" due to the "enlarged responsibilities" he undertook and because DISH believed that he could perform well "in a new role with new employees to manage." The EchoStar Succession Planning memorandum provided the following justification for the Plaintiff's promotion: "Continues to be a stellar performer; Knows the South Asian business intimately; Consistently over delivers; Maintains an extremely high level of work ethic; Models the highest level of professionalism."

6

**B.     OVER THE PLAINTIFF'S OBJECTION, DISH AWARDED
        THE VENDOR AN EXCLUSIVE AGENCY RELATIONSHIP**

19.     In response to Ms. West's direction, the Plaintiff furnished to Ms. West with the name of five marketing companies, including the Vendor, to potentially be retained by DISH as a new marketing and event agency to furnish grass roots marketing services.  After interviewing a number of the marketing agencies, Ms. West determined in or around April 2007 to retain the Vendor on a non-exclusive basis to furnish grass roots marketing services.

20.     Upon information and belief, Sona Patel, purported to be the owner and CEO of Dreamakers.  Sona Patel is actually an alias for Jalpa Kalaria.

21.     Ms. West and Ms. Slowikowska repeatedly praised the savings that Dreamakers purported to generate for DISH and Ms. Patel's professionalism.  To curry favor with Plaintiff's supervisors, the Vendor offered prices for marketing activities substantially below its competitors.

22.     In addition to furnishing marketing services to DISH, Ms. Patel was retained by several South Asian channels seeking to be launched on DISH.  Ms. Patel successfully pitched to Ms. Slowikowska two channels that DISH agreed to purchase the rights to broadcast on its satellite.  Ms. Slowikowska constantly dealt with Ms. Patel directly regarding the negotiation of the rights to broadcast those two channels along with the marketing that those two channels were required to perform as a condition of their contracts with DISH.

23.     On Ms. Patel's trips to Denver, she regularly visited with Ms. Slowikowska and Ms. West, including by taking them out to dinner.  Additionally, Ms. Slowikowska and Ms. West made frequent trips to New York and other cities, where they met with Ms. Patel.

24.     In October 2007, Plaintiff forwarded to Ms. West a complaint from a programmer about the Vendor's unprofessional and abusive behavior.

7

25.     In the end of 2007, the Vendor sought from Ms. West to be retained as the exclusive marketing agency for grass roots events, along with print, online and other media advertisements for the South Asian market.  This constituted a significant expansion of the Vendor's responsibilities.  Out of the $2 million DISH spent annually on advertising for its South Asian business, DISH only had allocated about $65,000 of that marketing budget towards grass roots marketing.

26.     At Ms. West's direction, the Vendor was granted an exclusive agency from January 2008 through June 30, 2008, despite the Plaintiff's written recommendation to Ms. West and DISH's legal department that the Vendor not be awarded this exclusive agency.  Subsequently, Ms. West expanded the Vendor's duties to include providing marketing services for the French and Arabic channels as well, despite her lack of experience in handling these market segments.

27.     The Vendor continued as the exclusive marketing agency for DISH's South Asian business from July 1, 2008 until when the Vendor was terminated on or about September 25, 2008.  However, after June 30, 2008, no formal agreement was executed extending the Vendor's relationship with DISH due to the Plaintiff's repeated questioning of the legitimacy of the Vendor's activities.

## C.     THE BRIBERY OF THE PLAINTIFFS' SUPERVISORS IN THE INTERNATIONAL MARKETING AND PROGRAMMING DEPARTMENT

28.     Several years before DISH hired the Plaintiff, DISH had terminated its Director of International Operations for accepting cash bribes from a South Asian programmer seeking inclusion of one of its channels in a premium package of Hindi channels offered by DISH to subscribers.  Both Ms. West and Ms. Slowikowska worked in DISH's International Department at the time.  DISH continued to conduct business with the programmer that paid the bribe, along

with the programmer's marketing affiliate which facilitated the bribe. Ms. Slowikowska also launched several of this programmer's channels in the last few years, and had worked closely with this programmer during Plaintiff's employment with DISH.

29.     Upon information and belief, Ms. West began receiving improper gifts from programmers (i.e., companies seeking to contract with DISH to launch their content on DISH's satellite) before DISH hired the Vendor or the Plaintiff.

30.     In April 2008, the Vendor offered to provide Ms. West with a luxury Mercedes Benz at a substantial discount. Ms. Patel purportedly had told Ms. West and Ms. Slowikowska that she "received two free cars a year and several more at a discount" due to her family medical business.[2]  In June 2008, just before the exclusive agency relationship was set to expire, Ms. West was told that she only would need to pay $12,000 for a custom-built car that cost more than $80,000. Ms. West did not receive the Mercedes until September 19, 2008, although it was supposed to be delivered months earlier. Upon information and belief, Ms. Slowikowska had conversations with the Vendor about obtaining a Mercedes as well.

31.     The Vendor also offered discounted gift cards to DISH employees. Ms. Slowikowska admittedly was in charge of the gift card program. DISH employees told Ms. Slowikowska how many cards they wanted and an order would be placed with the Vendor. The cards would then arrive at DISH's Englewood facility where they would be distributed. If the cards had a $50 face value, the DISH employee paid somewhere between $20 and $25 for the

---

[2]   Ultimately, Ms. West confessed in a September 29, 2008 email sent to Charles Ergen, DISH's Chief Executive Officer, that: "Sona told my team that she got the cars at a discount due to her family medical business, whereby they purchased up to 200 Mercedes and other cars for their top sales people and the doctors that belonged to the association. As a result of the huge amount purchased, she told myself, Izabela Slowikowska (Programming GM) and other members that she received two free cars a year and several others at a discount."

card. Ms. Slowikowska supervised the collecting of the money from DISH employees to send back to the Vendor. As many as 500 cards were received in one shipment.

32.    Even attorneys working in DISH's legal department received discounted gift cards from the Vendor, along with discounted or upgraded airline flights. Thus, DISH's own legal department had ratified the Vendor's gift-giving program. DISH's legal department also had failed to implement the proper internal controls when terminating Ms. West's predecessor as the head of the international department for accepting bribes from a South Asian programmer.

33.    At DISH's annual meeting in Nashville, the Vendor paid for dinner for DISH's entire International Marketing and Programming Department and provided all of the attendees with free gift cards (DOL Findings, p. 3). Tellingly, a marketing manager for DISH told the DOL that "it appeared to him that the Vendor was running the South Asian department and DISH employees did what she asked" (DOL Findings, p. 3).

34.    Additionally, programmers bribed senior employees in DISH's international marketing department either directly, or through Dreamakers. These programmers were seeking for the DISH executives to broadcast their channels, or to overlook their deviation from contract terms after their channels were launched.

35.    One programmer seeking to launch a South Asian channel on DISH gave Ms. West a Longine watch. Subsequently, the same programmer, through Ms. Patel arranged for Ms. West to receive two Rolex watches worth more than $30,000. This same programmer allowed Ms. West to use his personal credit card. Ms. Patel informed her associates that one of the Rolex watches was intended for Ms. Slowikowska.

36.    Additionally, a different programmer, upon information and belief, provided Ms. West with thousands of dollars of cash to gamble with in Atlantic City.

37.     Upon information and belief, Ms. Slowikowska received gift cards, international airline tickets for her and her family, expensive spa treatments, tickets to Broadway shows, limousine rides and expensive dinners.   Ms. Slowikowska testified before the DOL that she did not believe that the Plaintiff benefited from the Vendor's schemes (DOL Findings, p. 6).

**D.     PLAINTIFF REPORTS AND OPPOSES
        THE VENDOR'S INVOICING FRAUD**

38.     In February 2008, shortly after DISH expanded the Vendor's responsibilities, Plaintiff complained to his supervisors that the Vendor was dilatory in furnishing corroboration that certain marketing activities occurred as required by DISH's procedures.

39.     By the Spring of 2008, Plaintiff began questioning the legitimacy of the Vendor's invoicing.   The Plaintiff informed Ms. West and Ms. Slowikowska that the Vendor had fraudulently invoiced DISH with respect to on-line advertising, placing certain billboard advertisements, a theatrical advertising campaign and a promotional give-away campaign.

40.     Ms. Slowikowska and Ms. West were complicit with respect to the Vendor's fraudulent invoicing of DISH for online advertising services.   Despite having procured an exclusive marketing contract, the Vendor initially subcontracted with another company, Anhad, Inc., to perform the online marketing services for DISH.   To confirm that the proper online marketing activities took place, Anhad, Inc. had furnished to DISH screen shots of the website advertising along with analytic reports generated by the websites as required by DISH's accounting policies.

41.     In or around May or June 2008, the Vendor determined to discharge Anhad, Inc. and to perform the marketing services directly.   The Vendor was required to provide to the Plaintiff on a quarterly basis a marketing plan detailing the advertising to be placed on a number of South Asian websites – i.e., the size of the advertisements, whether the ads were to run

nationally, whether the ads were to be static, where on the website the advertisements should appear, etc.   DISH's Accounting Department prepared a purchase order for the marketing services after Ms. West approved the marketing plan.

42.     In August 2008, Plaintiff commissioned five DISH employees to check for the online advertising of DISH on the websites specified in the Vendor's marketing plan after he did not see the advertising himself.  Plaintiff also had received complaints from DISH retailers and programmers that the advertising was not properly performed.  Mr. Kshetrapal's investigation revealed that some on-line advertising did not appear at all, other advertisements redirected persons who clicked on the advertisements to the Vendor's website instead of DISH's website, some advertisements were a fraction of the specified size (for a fraction of the cost), and some advertisements on the South Asian websites were not placed nationally.

43.     Mr. Kshetrapal furnished detailed reports to Ms. Slowikowksa and Ms. West specifying the on-line advertising that was not properly performed.  These reports also confirmed that theatrical advertisements and billboard advertisements were not placed at specified locations throughout the country.  As Mr. Kshetrapal stated, "My job is to bring to light what I see to make sure DISH is not taken for a ride."

44.     At the same time, Mr. Kshetrapal also pleaded with Ms. West in an August 22nd email that Ms. Patel: "continuously threatens me with my job.  She had been boasting in the market that she is very close to you and can get anything done….Sona has led [a programmer] to believe that it is only through [her] that anything can be done at DISH."  Plaintiff elaborated in an email dated August 29, 2008, "[The Vendor] was straight till the time I was monitoring her activities by the checks and balances that were in place.  The day her company had a way to supersede my decisions, [she] has slacked off as you can see.  I have shared with you scores of

12

complaints from not only third parties but even our TOP RETAILERS, yet it seems that [she] is

still right in your eyes."

45.     Ms. West and Ms. Slowikowska responded by attempting to stifle the Plaintiff's

complaints of the Vendor's wrongdoing. As the DOL observed:

> One of the tasks Ms. West assigned to Ms. Slowikowska was to check on Complainant's allegations of fraud in the vendor's placement of on-line ads. The only way to verify the accuracy of Complainant's allegations would have been to look at the contract or invoices for ad placement and then look for the ads. Given her knowledge and understanding of DISH's marketing procedures Mr. Slowikowska would have been aware of this.

> According to Ms. Slowikowska, Ms. West only sought verification that on-line ads had been placed not that they had been placed as required in the purchase orders or as set forth in the invoices. Ms. Slowikowska flew to New York to meet with the vendor and during that trip she asked the vendor to show her the ads. Respondent Slowikowska wrote to Complainant that she had verified ad placement and she argued against pulling the vendor's authority to place on-line ads. This email indicated that Ms. Slowikowska had verified that at least some ads were placed properly. However, Ms. Slowikowska had not verified that the ads were placed as required by the contract with the vendor. She only verified that there were ads. Based on her statements and her past experience Ms. Slowikowska knew that she had not verified that the ads were placed according to contract specifications.

DOL Findings, p. 4.

46.     Conspicuously, Ms. Slowikowska never identified which websites she

purportedly checked to confirm that the Vendor properly performed the online advertising. Nor

did she provide any screenshots or analytic reports from the websites themselves to contradict

the Plaintiff's claims about the fraudulent invoicing.

47.     In an August 28, 2008 email, Ms. Slowikowska scolded the Plaintiff for

recommending that on-line advertising be removed from the Vendor's list of responsibilities:

> "I had a meeting with sona and outlined the procedures as agreed during our call. She has until tomorrow to let me know. So now you want me to go back and tell her that she does not have online?"

48.    On August 29, 2008, Ms. West reprimanded Mr. Kshetrapal in several emails, on which Ms. Slowikowska was copied, for investigating the Vendor's activities:

> "Swati is not getting paid to be at home and check websites.  She should be working on the marketing plans"; and

> "What independent entities are you using? Why would you even do this? No wonder sona gets pissed at you. You are trying to make her out a liar. I trust what Izabella is telling me that she said and went through Pooja's emails and saw the proof online.

49.    Mr. Kshetrapal also reported that the Vendor had not fulfilled a marketing campaign to install DISH Network in retail stores frequented by South Asians, along with the display of DISH advertising in the same stores, despite having been paid to do so.  Additionally, Mr. Kshetrapal reported that his team had confirmed that qualified subscribers who purchased the "Hindi Mega-Pack" never received coupons from various companies, such as Etihad Airlines, even though DISH had paid the Vendor to execute this campaign.

50.    Further, Plaintiff complained to Ms. West that Ms. Slowikowska had directed him to fabricate purchase orders to cover-up for the Vendor.  In response to the Vendor failing to furnish to DISH the list of events at which the Vendor will perform grass roots marketing for the upcoming month, Ms. Slowikowska told the Plaintiff that he should fabricate a purchase order based upon the events and pricing contained in the purchasing order for the prior year for the same month.

51.    On August 29, 2008, Ms. Patel, while driving in a car with Ms. Slowikowska and the Plaintiff in New York, offered the Plaintiff a payment of $100,000 if he would be more cooperative with the Vendor's invoices.  The Plaintiff refused to accept this money despite Ms. Slowikowska's encouragement of him to do so.

**E.   THE FRAUDULENT INVOICING AND
      BRIBERY SCHEME IS FULLY EXPOSED**

52.   DISH's accounting policies required the Vendor to submit a notarized statement affirming the proper completion of the services, along with other proof that the services were performed, when submitting an invoice for payment.  Further, Ms. West and the Plaintiff were required to sign the invoices to confirm that the Vendor properly performed the services in accordance with the purchase order.  As the Plaintiff later learned, Ms. West sometimes signed off on the Vendor's invoices without even consulting with him or even when he had refused to sign off on the Vendor's invoices.

53.   In September 2008, Plaintiff refused to sign-off on invoices submitted by the Vendor concerning marketing activities purportedly performed by the Vendor over the previous quarter as the Vendor failed to submit the proof of activity required by DISH's accounting rules.

54.   Ms. Patel demanded that Ms. West discharge Mr. Kshetrapal for his ardent opposition to Dreamakers' conduct.  When Ms. West refused, Ms. Patel attempted to blackmail Ms. West with respect to her acceptance of the Mercedes.  Ms. West, while accompanied by Ms. Slowikowska, reported to Eric Sahl, the Senior Vice President of Programming, her receipt of the Mercedes. Mr. Sahl involved DISH's Compliance Department and Charles Ergen.

55.   Mr. Kshetrapal fully cooperated with DISH's internal investigation including by describing the participation of Ms. West and Ms. Slowikowska in the wrongdoing.  At the beginning of the investigation, Plaintiff told DISH's Compliance Department that Ms. Slowikowska had encouraged him to accept a cash bribe offered by the Vendor and later reiterated the same allegation in writing.  Plaintiff first learned that Ms. West had received the Mercedes and Rolexes during DISH's investigation.

56.     Ultimately, after the Vendor's discharge, DISH's internal audit department and Corporate Compliance Department conducted a forensic audit which corroborated the Plaintiff's claims regarding the Vendor's fraudulent invoicing.

57.     In October 2008, DISH severed its relationship with Dreamakers, discharged Ms. West, and several senior Executives assigned to the International Department resigned. DISH issued a Final Warning to Ms. Slowikowska for her role in accepting and distributing discounted gift cards provided by the Vendor to DISH employees. Inexplicably, and without justification, in November 2008, DISH forced the resignation of Mr. Kshetrapal.

**F.    PLAINTIFF TESTIFIED ABOUT THE FRAUD IN LITIGATION BETWEEN DISH AND THE VENDOR**

58.     On December 22, 2008, the Vendor filed a breach of contract action against DISH ("the Aman litigation").   On January 30, 2009, DISH answered the complaint and filed two counterclaims.  In September 2009, DISH amended its answer to allege additional counterclaims. In reliance on the Plaintiff's complaints, DISH alleged in its amended answer that the Vendor:

      a.    "willfully and improperly secured payment from DISH for marketing services which were never rendered or rendered at a cost to Dreamakers that was less than the amount Dreamakers charged DISH";

      b.    "made false representations and omissions of material fact concerning marketing services and gifts in an effort to initiate and maintain business relations with DISH";

      c.    "engaged…in a pattern of activity designed to obtain the award of business contracts through the provision of improper favors and personal gifts that it knew or should have known were violations of ordinary business ethics;"

      d.    "encouraging personnel of DISH to award contracts to Dreamakers with offers of personal favors and personal travel that were excessive and known, or should have been known, to give Dreamakers an unfair business advantage as against any other competitor for such work from DISH."

59.     In October 2009, DISH's counsel in the Aman litigation repeatedly sought to represent Mr. Kshetrapal at his deposition.  By this juncture, DISH purportedly had investigated thoroughly the fraudulent invoicing and bribery scheme.

60.     Mr. Kshetrapal sought assurances from DISH's counsel that DISH would not retaliate against him by interfering with his current employment in New York for testifying truthfully at his deposition.  In response, DISH's counsel sent to Mr. Kshetrapal correspondence to be forwarded to his employer, which stated that: "Mr. Kshetrapal has fully cooperated with DISH, and will be defended by DISH.  This litigation has nothing to do with your company, or personally with respect to Mr. Kshetrapal."  DISH's counsel at no point indicated that DISH had instituted a policy of refusing to conduct business with him or any company that employs him.

61.     At his deposition, Mr. Kshetrapal testified extensively regarding the Vendor's invoicing for services not performed at all, her overbilling and her cover-up of this misconduct by refusing to provide support for her alleged invoices in accordance with DISH's accounting policies.  Moreover, the Plaintiff testified that after the Vendor became the exclusive marketing agent for South Asian programming, the Vendor: (i) determined what marketing activities DISH engaged in based on the Vendor's profit margin as opposed to the effectiveness of the marketing for DISH; and (ii) extracted and/or threatened to extract  a "cut" from third parties seeking to transact business with DISH.  Moreover, the Plaintiff testified that he repeatedly complained about the aforementioned wrongdoing, orally and in writing, to Ms. Slowikowska and Ms. West, who repeatedly overruled his complaints about the Vendor's conduct and even directed him to fabricate reports to cover-up for her.

62.     DISH's counsel asserted the existence of an attorney-client privilege with Mr. Kshetrapal at his deposition.

63.    DISH's counsel extensively interviewed the Plaintiff about the fraud before his testimony and again after his deposition testimony.   During these interviews, Mr. Kshetrapal discussed Ms. Slowikowska's participation in the fraud, including her encouragement of him to accept the Vendor's bribe.   Plaintiff also reviewed in detail with DISH's counsel, and a member of DISH's accounting department, the invoices that DISH had identified as fraudulent based on the Plaintiff's complaints made during his employment.

**G.    DISH BLACKLISTED THE PLAINTIFF**

64.    On January 1, 2009, DISH appointed Chris Kuelling to replace Ms. West as Vice President for International Programming.   By this juncture, Ms. Slowikowska was the only management level person left in the International Department and she even had taken over Ms. West's job on an interim basis.   Ms. Slowikowska informed Mr. Kuelling with respect to the "situation" involving the Plaintiff, Ms. West and the Vendor.

65.    In January 2009, Plaintiff obtained a job in New York with SAAVN as a Senior Vice President of South Asian Marketing, Media and Partnerships.   SAAVN is a Bollywood music streaming service with over ten million users worldwide and was recognized by Forbes magazine as one of the 90 most promising companies in America.

66.    Mr. Kshetrapal has since learned that Ms. Slowikowska has orchestrated a campaign to blacklist him from working in the South Asian marketing and entertainment industry in retaliation for his reports implicating Ms. Slowikowska in the fraud.

67.    At a South Asian programmer's meeting held in the end of 2008, Ms. Slowikowska participated in multiple conversations with industry programmers in which the largest scandal in DISH's history was blamed on the Plaintiff and Ms. West.   Ms. Slowikowska also had phone conversations with programmers in the wake of the shake-up in which she

18

specifically attacked the Plaintiff's ethics or made comments that we "got rid of the bad people."
After the Plaintiff's departure, Ms. Slowikowska repeatedly referred to the Plantiff's "shady"
business ethics in a sarcastic tone in conversations with other DISH employees or programmers.

68.     In the fall of 2009, a DISH marketing manager placed online advertising with
SAAVN through a new marketing agency which had replaced the Vendor.   Subsequently,
Ms. Slowikowska very clearly told the DISH marketing manager not to transact further business
with SAAVN.   DISH's cancellation of its advertising with SAAVN occurred during the course
of Plaintiffs' communications with DISH's counsel in the Aman litigation about
Ms. Slowikowska's role in the fraud.   Further, DISH told a second marketing agency that DISH
was not interested in advertising with SAAVN because SAAVN purportedly did not fit DISH's
profile.   These statements were understood, and intended to convey, an intent by DISH to steer
away from conducting business with any company which employed the Plaintiff.

69.     In or around June 2010, DISH caused Nimbus Communications Limited
("Nimbus") to rescind an offer it had made to Mr. Kshetrapal to serve as the "in-country" head of
a new cricket channel that Nimbus was planning to launch in the United States called NeoSports.
About three or four days after Nimbus offered the position to the Plaintiff, Prasana Krishnan, the
Chief Operating Officer for the cricket channel, informed the Plaintiff that he was rescinding the
offer for the in-country head position.   Mr. Krishnan told Plaintiff that DISH's International
Programming Department conveyed to NeoSports that it did not want Plaintiff at the helm of the
channel.   Mr. Krishnan further conveyed his concern that hiring the Plaintiff as its in-country
head would jeopardize Nimbus' ability to broadcast NeoSports on DISH.

70.     Before rescinding the offer, Nimbus informed Mr. Kuelling and/or
Ms. Slowikowska that Nimbus was considering Mr. Kshetrapal for the in-country head position.

Indeed, Mr. Kshetrapal was Nimbus' first choice for the position before Nimbus contacted DISH.  Mr. Kuelling and Ms. Slowikowska then discussed the Plaintiff's candidacy at a meeting, with another DISH employee present.  Ms. Slowikowska conveyed to Mr. Kuelling that she did not believe that Mr. Kshetrapal should obtain the position with NeoSports and was highly critical of the Plaintiff during that meeting (DOL Findings, pp. 7-8).[3]

71.    Mr. Kuelling subsequently provided a negative reference to Nimbus about the Plaintiff and encouraged Nimbus to hire another candidate it was considering.  Mr. Kuelling told a Nimbus official that Plaintiff was "aggressive," "pushy" and "good for selling things" but that he had no head of business experience.  Mr. Kuelling provided a positive recommendation about the other candidate and said that the other candidate had good relations in the industry, but did not provide the same feedback with respect to the Plaintiff.

72.    Mr. Kuelling's provision of a negative reference about the Plaintiff to a potential employer violated DISH's neutral reference policy.   Mr. Kuelling also provided untruthful explanations to the DOL about his role in interfering with Plaintiff's ability to procure the Neo Sports position of in-country head.[4]

---

[3]    Ms. Slowikowska's claim that out of business necessity DISH needed to steer clear away from Plaintiff to avoid any appearance of impropriety in light of his purported involvement in the largest scandal in DISH's history is rendered incoherent, by among other things, Ms. Slowikowska's public displaying of Ms. West's September 2010 recommendation of her on her public LinkedIn profile.

[4]    At first, DISH told the DOL that Mr. Kuelling did not participate in blacklisting the Plaintiff because Mr. Kuelling did not know the Plaintiff.  Mr. Kuelling then changed his story after Plaintiff provided to the DOL copies of extensive correspondence between he and Mr. Kuelling dating back to the time of Plaintiff's employment with DISH.  Mr. Kuelling then told the DOL that he did not "say anything about the [Plaintiff] except that he had been involved in sales." This second story was contradicted by testimony provided by a Nimbus official and a South Asian Marketing Manager for DISH.

73.   Defendants also disparaged the Plaintiff to his present employer and specifically told his employer that DISH will not transact business with SAAVN.  In or around December 2010, a sales employee for SAAVN inquired from Mr. Kuelling whether DISH was interested in advertising its Bollywood content on SAAVN's websites, which target the same audience.

74.   On March 1, 2011, after several months of communications, Mr. Arora advised SAAVN in an email that:

> The direction internally at this time is not to work with Saavn, I can elaborate on the phone if you would like me to. Having said that we wish you the best and hopefully we can work together in the near future!

75.   Later that same day, Mr. Arora explained to SAAVN over the speakerphone that DISH's management is unwilling to work with SAAVN because it employs Mr. Kshetrapal.  Mr. Arora further told the Plaintiff's colleagues that working with SAAVN "is something for which I will not get approvals, if I even think of doing it."

76.   Mr. Arora further indicated that SAAVN, a much smaller player in the South Asian entertainment market, would make a "great partnership" for DISH and that "hopefully things will change" in the future.  Unmistakably, Mr. Arora, at Ms. Slowikowska's direction, implored Mr. Kshetrapal's employer to discharge him if SAAVN wished to distribute its Bollywood Media through DISH and to procure DISH's lucrative advertising contracts.

77.   As part of DISH's campaign to blacklist Mr. Kshetrapal and interfere with his current employment, DISH has refused to contract to broadcast the Bollywood content produced by Mr. Ksehtrapal's clients.  DISH is exploiting its market position to pressure Mr. Kshetrapal's clients to cease utilizing Mr. Kshetrapal's services and to retain distributors of Bollywood media with whom DISH will conduct business.

78.    In March 2011, Plaintiff presented to Mr. Kuelling a very highly rated Bollywood music channel that had retained SAAVN to help launch the channel in the United States. Ms. Slowikowska advised Mr. Kuelling that DISH should not pursue the channel because "of [Plaintiff's] prior unethical behavior" (DOL Findings, p. 9).

79.    To cover-up for Ms. Slowikowska, Mr. Kuelling told the DOL that DISH decided not to launch the channel because of a lack of bandwidth.  Nevertheless, after Plaintiff had pitched the music channel, DISH subsequently launched three lower rated South Asian music channels, including one only five months later, along with approximately fifty more international channels.

80.    Even during the pendency of the DOL proceedings, Ms. Slowikowska importuned a programmer and its marketing affiliate (*see* ¶28, *infra*) to blacklist the Plaintiff, and to harass him, for the Plaintiff's pursuit of his claim before the DOL.  According to the programmer, Ms. Slowikowska blamed DISH's inability to work with the programmer on Plaintiff's reports to the DOL about the recurrent bribery of DISH officials.  In retaliation, the programmer told Plaintiff that the programmer would not conduct business with SAAVN only for so long as the Plaintiff continued to work there.

81.    In sum, Defendants' retaliatory motive is evidenced by their false, contradictory and incoherent justifications for their conduct.  The credibility of DISH's explanations for its treatment of the Plaintiff is further undermined by its revelation before the DOL that it had engaged in the prejudicial destruction of relevant information despite being clearly notified of a duty to preserve evidence.[5]

---

[5] Upon being notified of this fraud scheme, DISH failed to take the proper steps to preserve communications among and between the Vendor, Ms. West, Ms. Slowikowska and other key actors in this scandal.  Multiple courts have sanctioned DISH for engaging in the "gross

## LEGAL CLAIMS

### COUNT I

### VIOLATION OF THE SARBANES OXLEY ACT AGAINST ALL DEFENDANTS

82.     Plaintiff repeats and realleges each and every allegation contained in each preceding numbered paragraph of this Complaint as if fully set forth herein.

83.     Section 1514(a) of SOX prohibits publicly-traded companies from discharging, demoting, suspending, threatening, harassing or in any other manner discriminating against an employee in the terms and conditions of employment for engaging in protected activity under SOX.

84.     SOX protects "former employees," such as Mr. Kshetrapal, for retaliation perpetrated against them for having engaged in protected activity, particularly where, as here, the retaliation involves blacklisting and interference with subsequent employment. The implementing regulations for SOX, at 29 C.F.R. § 1980.101, defines an "employee" to include "former employees."

85.     Blacklisting is a "quintessential" and often "insidious and invidious" form of retaliation. "[E]ffective enforcement of the Act requires a prophylactic rule prohibiting improper

spoliation of evidence." *Broccoli v. Echostar Communications Corp*, 229 F.R.D. 506 (D. Md. 2005) ( "the evidence of a regular policy at Echostar of 'deep-sixing' nettlesome documents and records (and of management's efforts to avoid their creation in the first instance) is overwhelming"); *Air Communications & Satellite, Inc. v. Echostar Satellite, LLC*, 2010 WL 9035988 (Colo. Dist. Ct. April 2, 2010)( finding that DISH engaged in bad faith by concealing the existence of over one million emails and documents on a laptop computer of a key custodian for more than eight years after litigation was commenced, and five years after DISH took possession of the laptop*); Voom HD Holdings, LLC v. Echostar Satellite, LLC*, 93 A.D.3d 33 (1st Dep't 2012) (holding that DISH acted in bad faith or with gross negligence as DISH did not "cease the automatic destruction of e-mails until four months after this action was commenced"). Significantly, *Voom HD Holdings* involved some of the same custodians of emails as the present case- such as Ms. West's supervisor Eric Sahl and DISH's general counsel Jeffrey Blum, both of whom were actively involved in responding to Ms. West's admission that she accepted the Mercedes from the Vendor.

references" in retaliation for an "employee's protected activity whether or not the employee has suffered damages or loss of employment opportunities" (DOL Findings, p. 11).

86.     Section 1514(a)(a)(1) prohibits a covered employer from discriminating against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information to the employer, a federal agency or Congress concerning violations of 18 U.S.C. §§1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud), or any other federal law relating to fraud against shareholders.

87.     Section 1514(a)(2) prohibits publicly traded companies from retaliating against an employee for "testifying" in a "proceeding" relating to mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, or fraud on the shareholders.

88.     Mr. Kshetrapal engaged in protected activity by opposing and reporting internally the fraud scheme, during his employment and afterwards, and by testifying about the fraud scheme in a deposition in a federal case.

89.     The fraud scheme extensively involved the use of the wires and mails across interstate lines and therefore transgressed 18 USC §§ 1341 and 1343 as well as constituting a fraud on DISH's shareholders.   Plaintiff also engaged in protected activity by reporting violations of the company's internal accounting controls as required by Section 13 of the Securities and Exchange Act and 15 U.S.C. §78m(b)(2)(B).

90.     Plaintiff engaged in protected activity under §1514(A) by reporting the complicity of his supervisors in this scheme.

91.     Plaintiff engaged in protected activity under §1514(A) by reporting that the Vendor submitted fraudulent invoices and was receiving payments in violation of the company's internal controls.

92.    DISH has inflicted substantial harm upon Mr. Kshetrapal through the aforementioned conduct.

93.    Mr. Kshetrapal is facing the prospect of being blacklisted from the only industry in which he has worked in over the last fifteen years.  DISH incessantly has persecuted him in a manner designed to discredit him in the industry.

94.    Accordingly, Mr. Kshetrapal is entitled to recover compensatory damages for economic harm, emotional distress, harassment and loss of reputation.   Mr. Kshetrapal also seeks to recover his attorney's fees and costs.

95.    Mr. Kshetrapal also seeks to enjoin DISH from continuing to blacklist him and from interfering with his current employment and economic opportunities.

96.    Defendants Slowikowska and Arora were officers and agents of DISH and directly participated in the blacklisting of the Plaintiff in retaliation for his protected activity. Therefore, Defendants Slowikowska and Arora, for all of the reasons set forth above, are individually liable for the wrongful conduct alleged herein.

97.    Defendants' blacklisting of Plaintiff negatively affected Plaintiff's ability to earn wages commensurate with what he would have earned absent Defendants' blacklisting of him. In particular, Defendants' conduct caused Plaintiff to lose the position as head of in-country operations for Neo Sports at a significantly higher salary.  Thus, Plaintiff is entitled to recover these lost wages with interest.

98.    Additionally, Plaintiff is entitled to receive compensatory damages in an amount determined to be fair and equitable compensation for Plaintiff's emotional distress and loss of reputation, along with the recovery of his litigation costs, including expert witness fees and reasonable attorney's fees.

25

## COUNT II

### VIOLATION OF THE DODD FRANK ACT AGAINST ALL DEFENDANTS

99.    Plaintiff repeats and realleges each and every allegation contained in each preceding numbered paragraph of this Complaint as if fully set forth herein.

100.    Defendants have violated 15 U.S.C. §78u-6(h)(1), and its implementing regulation,17 CFR 240.21F-2, because their blacklisting of the Plaintiff was motivated in whole or in part by the fact that the Plaintiff made disclosures that were protected under SOX as well as by other laws, rules or regulations subject to the jurisdiction of the United States Securities and Exchange Commission ("SEC").

101.    Plaintiff is entitled to the whistleblower retaliation protection of Dodd-Frank because he is an individual who possessed a reasonable belief that the information he provided related to possible securities law violations that had occurred.

102.    Defendants violated 15 U.S.C. §78u-6(h)(1) because Plaintiff's protected activity was a contributing factor in their decision to blacklist him.

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST DISH AND SLOWIKOWSKA

103.    Plaintiff repeats and realleges each and every allegation contained in each preceding numbered paragraph of this Complaint as if fully set forth herein.

104.    Plaintiff entered into a contract with Neo Sports to serve as the head of its in-country operations as Neo Sports offered the position to Plaintiff and he accepted the position.

105.    Defendants had knowledge of this contract.

106.    Defendants have intentionally, maliciously and without justification interfered with Plaintiff's contract.

107.    As a result of the aforementioned intentional and wrongful acts of the Defendants, Plaintiff has been injured, for which he is entitled to recover compensatory damages and interest in an amount which the proof at trial may show, together with punitive damages.

## COUNT IV

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AGAINST DISH AND SLOWIKOWSKA

108.    Plaintiff repeats and realleges each and every allegation contained in each preceding numbered paragraph of this Complaint as if fully set forth herein.

109.    Prior to the Defendants' actions described above, Plaintiff enjoyed advantageous business relations with Neo Sports which would have continued to result in an economic benefit to Plaintiff.

110.    Utilizing wrongful means, Defendants have intentionally, maliciously and without justification interfered with Plaintiff's prospective business relationships.

111.    As a result of the aforementioned intentional and wrongful acts of Defendants, Plaintiff has been injured, for which he is entitled to recover compensatory damages and interest in an amount which the proof at trial may show, together with punitive damages.

## COUNT V

### DEFAMATION - AGAINST ALL DEFENDANTS

112.    Plaintiff repeats and realleges each and every allegation contained in each preceding numbered paragraph of this Complaint as if fully set forth herein.

113.    Defendant Arora's tape recorded statements to Plaintiff's employer on March 1, 2011 constituted slander per se.  Mr. Arora's statements can be readily interpreted as imparting to Plaintiff fraud, dishonesty, misconduct or unfitness in his business.  Additionally, Mr. Arora's

statements, when judged in the wake of the largest corporate scandal in DISH's history, certainly implied the existence of undisclosed and very damaging supporting facts about the Plaintiff.

114.   Indeed, in elaborating upon the basis for DISH's refusal to work with SAAVN, Mr. Arora analogized the Plaintiff to a convicted criminal who is likely to commit further crimes. Mr. Arora explained to the DOL that the Plaintiff's unethical conduct at DISH created a high probability that SAAVN would not ethically perform any contract with DISH because of the Plaintiff's employment there.  Mr. Arora's statements were intended to convey this message to Plaintiff's employer.

115.   Mr. Arora, who once directly reported to Plaintiff, admitted that he had no personal knowledge with respect to the Plaintiff allegedly engaging in any unethical behavior. Rather, he based his views on Eric Sahl's brief statement to him that Plaintiff was being let go due to a "trust issue" and Mr. Arora's conversations with Ms. Slowikowska about the scandal.

116.   Ms. Slowikowska slandered the Plaintiff when she told Mr. Arora that if DISH placed ads with SAAVN that an "extra layer of audit" would be required due to the Plaintiff's "prior unethical business conduct" (DOL Findings, p. 12).   Ms. Slowikowska further defamed the Plaintiff when she raised the Plaintiff's "prior unethical behavior" while Mr. Kuelling was evaluating the Plaintiff's submission of a music channel (DOL Findings, p. 11).  Ms. Slowikowska further defamed the Plaintiff within DISH, and in statements to industry programmers, by discrediting his business ethics.

117.   These false statements were maliciously and recklessly issued.  The statements injured the Plaintiff professionally, and, as such, are defamation per se.

28

118.   Mr. Arora issued his defamatory statements in his capacity as a DISH employee and pursuant to Ms. Slowikowska's direction.   Ms. Slowikowska issued her defamatory statements about the Plaintiff in her capacity as a high-level executive at DISH.

119.   Plaintiff has suffered, and will continue to suffer, substantial damage in an amount to be determined at trial as a result of Defendants' defamatory statements.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

A.   On the First Cause of Action, against all Defendants, awarding the Plaintiff compensatory damages in an amount to be determined at trial for lost wages, future pecuniary loss, damages to his career, emotional pain and suffering and injury to his reputation;

B.   On the Second Cause of Action, against all Defendants, awarding the Plaintiff compensatory damages in an amount to be determined at trial for lost wages, future pecuniary loss, damages to his career, emotional pain and suffering and injury to his reputation.  Plaintiff is entitled to two times the amount of back pay he is owed, with interest;

C.   On the Third Cause of Action, against DISH and Slowikowska, awarding compensatory damages and interest together with punitive damages in an amount to be proven at trial;

D.   On the Fourth Cause of Action, against DISH and Slowikowska, awarding compensatory damages and interest together with punitive damages in an amount to be proven at trial;

E.   On the Fifth Cause of Action, against All Defendants, awarding compensatory damages and interest together with punitive damages in an amount to be proven at trial;

F.      Declaring that the Defendants engaged in unlawful employment practices prohibited by Dodd-Frank and SOX by blacklisting the Plaintiff for engaging in protected activity;

G.      Enjoining the Defendants, pursuant to Dodd-Frank and SOX, from retaliating or discriminating against Plaintiff in any manner for engaging in any activity protected by Dodd-Frank or SOX or for instituting any proceeding under or related to SOX or Dodd-Frank;

H.      Awarding Plaintiff attorney's fees, costs and expenses incurred in the prosecution of this action;

I.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful conduct.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. Rule 38, Plaintiff hereby demands a trial by jury.

Dated: May 14, 2014
       New York, New York

HOFFMAN POLLAND & FURMAN PLLC

By:  _____
       Russell Bogart
       Hoffman Polland & Furman PLLC
       220 E. 42nd Street, Ste 435
       New York, N.Y. 10017
       Tel.: (212) 338-0700
       Fax: (212) 338-0093
       rbogart@hpf-law.com

30

# EXHIBIIT  A

**U.S. Department of Labor**     Occupational Safety and Health Administration
201 Varick Street, Room 670
New York, NY 10014
Tel: (212) 337-2365
Fax: (212) 337-2371



March 3, 2014

Peter Moskowitz
Jackson Lewis LLP
666 Third Avenue
New York, New York 10017

**Via Regular Mail and Certified Mail #7013 0600 0001 778 0894**

Re: DISH Network LLC[1], Izabella Slowikowska and Vikas Arora/Tarun Kshetrepal/2-4173-11-132

Dear Mr. Moskowitz:

This is to advise you that we have completed our investigation of the above-referenced complaint filed by Tarun Kshetrepal (Complainant) against DISH Network (DISH), Izabella Slowikowska and Vikas Arora (Respondents) on August 11, 2011, under 18 U.S.C. §1514A (SOX). In brief, Complainant alleged that your clients blacklisted him in retaliation for his reporting that a vendor was submitting fraudulent invoices and for testifying at a deposition.

Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region II finds that there is reasonable cause to believe that Respondent violated SOX and issues the following findings:

### Secretary's Findings

On March 1, 2011 Complainant overheard a telephone conversation where a DISH employee said that DISH would not do business with Complainant's current employer because Complainant worked there. On August 11, 2011 Complainant filed a complaint with the Secretary of Labor alleging that Respondent retaliated against him in violation of SOX. This complaint was filed within 180 days of the alleged adverse action and is timely. One other blacklisting instance occurred more than 180 days before the complaint was filed. Because Complainant did not have actual knowledge of that blacklisting until March 1, 2011 the complaint is also timely with respect to that instance.

Complainant worked for DISH and therefore was an employee within the meaning of 18 U.S.C. §1514A.

Respondent DISH is a company within the meaning of 18 U.S.C. §1514A

---

[1] Formerly, Echostar Satellite d/b/a DISH Network

because it is a company with a class of securities registered under Section 12 of the
Securities Exchange Act of 1934 (15 U.S.C. 78l) and is required to file reports under
Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78o(d)).  Respondents Izabella
Slowikowska and Vikas Arora were employees of DISH at the time of events set forth in the
complaint and are therefore covered.

## DISH's Marketing Department

Complainant worked as the General Manager of DISH's South Asian marketing business from
March 12, 2007 through November 7, 2008. His supervisor was Tracy Thompson West Vice
President for International Programming.  Also reporting directly to Ms. West was Respondent
Izabella Slowikowska[2].

Complainant was in charge of South Asian Marketing; he and his team would develop a
marketing budget to promote DISH's South Asian channels in the United States.  Complainant's
supervisor, Tracy Thompson West would approve and or modify the budget.  Once the budget
had been approved Complainant would let the DISH vendors know that they could place ads or
organize events by sending the vendor a purchase order.  Once the ad or event had taken place
the vendor would submit an invoice for payment.  One of Complainant's jobs was to ensure that
the vendors had actually performed the work they were invoicing.

While Complainant was at DISH he introduced a vendor[3] to the company. He informed the
company that he had a personal relationship with the vendor's owner and he informed
Respondent that his personal relationship with the vendor ended in June of 2007.

In April 2007, Complainant's supervisor, Tracy Thompson West contracted with the vendor for
her marketing services.  Before entering into the contract she examined written proposals from two
different vendors.  It was also Complainant's supervisor not Complainant who renewed the initial
contract.  The contract continued in effect until September 25, 2008.

In the summer of 2008, the vendor had provided Ms. West with a brand new $70,000+ Mercedes
Benz for which she paid the car dealer $12,000 (the vendor had paid the dealer the remainder of
the value or $64,000).  The vendor's generosity did not end with providing a Mercedes at a
substantial discount.

The vendor also offered discounted gift cards to other DISH employees. According to

---

[2] Respondent Izabella Slowikowska was described by Complainant as Ms. West's right hand.  In August of 2008 she
had been with DISH for 7 years.  When Ms. Slowikowska started with DISH she did marketing and worked her way
up to Marketing Manager.  Ms. Slowikowska described herself as familiar with all of the marketing protocols and
procedures including contracting for and verifying ad placement.  Complainant said that Ms. Slowikowska had
trained him how to do his job. Ms. Slowikowska denies training him.

[3] The vendor, Aman Entertainment d/b/a Dreamakers, provided marketing services, which included placing ads,
appearing at sales events on behalf of DISH as well as managing promotional campaigns.

Respondent Slowikowska, employees would tell her or an administrative assistant how many
cards they wanted and an order would be placed with the vendor.   The cards would then arrive at
DISH's Englewood facility where they would be distributed.  Respondent Slowikowska or the
administrative assistant would then be responsible for collecting the money for the cards and
remitting that money to the vendor.   Respondent Slowikowska said that if the cards had a $50
face value, the employee would pay somewhere between $20 and $25 for the card[4].  In addition,
the vendor offered free upgraded airline tickets for DISH personnel.  Finally, the vendor paid for
DISH's International Programming meeting that took place in Nashville in 2007 or 2008.  In
addition to the meeting, the vendor paid for dinner and provided all of the attendees with free gift
cards.  Apparently, none of these gifts were reported to the appropriate DISH officials.

## Complainant Reports Fraudulent Invoices

In the summer of 2008, Complainant reported to Ms. West, that the vendor was defrauding DISH
by charging for work that it had not done.  In one e-mail he said, "My job is to bring to light
what I see to make sure DISH is not taken for a ride."

In August of 2008 Complainant reported what he believed to be a problem to Ms. West; the
vendor was charging DISH for on-line ads and the ads did not appear where they were supposed
to appear.  In other words, if the ads were supposed to be national they did not appear nationally.
He also wrote to the vendor who responded to Complainant's concerns on August 22, 2008
saying, "I have already done a lot for your VP and she is in my pocket, I can have you fired in
the snap of a finger." Unbeknownst to Complainant, this was about the same time his supervisor
negotiated with the vendor for a Mercedes.  Complainant suggested to Ms. West that they remove
the vendor's authority to place on-line ads.  His request was denied[5].

Respondent Slowikowska described the working atmosphere in the summer of 2008 as very
difficult and said that her boss, Ms. West asked her to help in resolving a "situation" between the
vendor and Complainant.  She said that the "situation" arose due to personal problems in the
relationship between the vendor and Complainant.  Ms. Slowikowska stated that she was asked
to help out in this way in the last month or so before Ms. West left DISH.   Complainant stated
that he had terminated his personal relationship with the vendor over a year before he discovered
the improper invoices.

One of the tasks Ms. West assigned to Ms. Slowikowska was to check on Complainant's
allegations[6] of fraud in the vendor's placement of on-line ads.  The only way to verify the
accuracy of Complainant's allegations would have been to look at the contract or invoices for ad

---

[4] Respondent Slowikowska was in charge of the gift card program.
[5] One former DISH employee said that when he began working in DISH's international department it appeared to
him that the vendor was running the South Asian department and DISH employees did what she asked. .
[6] Slowikowska denies that she had any supervisory authority over Complainant though e-mails, employee interviews
and Complainant's interview suggest otherwise.

placement and then look for the ads.  Given her knowledge and understanding of DISH's
marketing procedures Ms. Slowikowska would have been aware of this.

According to Ms. Slowikowska, Ms. West only sought verification that on-line ads had been
placed not that they had been placed as required in the purchase orders or as set forth in the
invoices.  Ms. Slowikowska flew to New York to meet with the vendor and during that trip she
asked the vendor to show her the ads.   Respondent Slowikowska wrote to Complainant that she
had verified ad placement and she argued against pulling the vendor's authority to place on-line
ads.  This e-mail indicated that Ms. Slowikowska had verified that at least some ads were placed
properly.  However, Ms. Slowikowska had not verified that the ads were placed as required by
the contract with the vendor.  She only verified that there were ads.  Based on her statements and
her past experience Ms. Slowikowska knew that she had not verified that the ads were placed
according to contract specifications.

Complainant, at this point, began to note hostility from Ms. Slowikowska toward him.  He wrote
her at least two e-mails acknowledging difficulties between the two of them as well as a partial
undated e-mail produced by Respondent in which Complainant states that he is sorry that the
vendor has created "so much misunderstanding between me … and my dear colleagues like
Izabela…" Ms. Slowikowska told OSHA that she was upset with the "situation" and held
Complainant responsible for having brought the vendor on-board.

Respondent DISH in its position statement and Ms. Slowikowska in her interview, with OSHA,
blamed the increasingly difficult "situation" between the vendor and Complainant on the
personal relationship between Complainant and vendor that had gone sour.

To support this allegation Respondent DISH presented a document allegedly penned by
Complainant as part of its position statement.  Complainant denies any connection with the
document.  When asked[7] to verify the authenticity of the document Respondent DISH stated,
"Upon information and belief it was provided by Complainant to Mr. Hankins.". Despite being
asked to do so, Respondent provided no other information such as metadata that would tie the
letter to Complainant or his DISH computer.  Mr. Hankins, a current DISH employee never
provided so much as an affidavit.   Respondent DISH did not authenticate this document
therefore OSHA does not consider the document to be credible evidence.

Ms. Slowikowska supports her contention of the soured relationship causing the difficult
"situation" by pointing to conversations with the Complainant about his personal relationship
with the vendor; conversations that he denies having had in 2008.  The e-mail traffic produced
by Respondent for this July-September 2008 period indicates that the vendor had problems
working with other DISH employees as well.

---

[7] The following was sent to Respondent, "For Exhibit D please explain how the document came into your client's
possession.  Please provide all relevant identifying information that ties the letter to Complainant.  If you have no
such information please explain why you believe this document to be true and accurate."

DISH Network LLC, Izabella Slowikowska and
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

## Complainant's Blowing the Whistle Caused Conflict

The evidence outlined above suggests that the "situation" was triggered by Complainant's fraud allegations[8] not by a personal relationship gone sour. First, there is the proximity in time between Complainant's allegations of vendor fraud and the ensuing "situation"; second, Complainant and DISH had continued to do business with the vendor for more than a year after Complainant says he ended their liaison; third, other employees at DISH began to have trouble with the vendor; finally DISH presented no credible proof to support its theory.

## DISH Terminates Relationship with Vendor and Disciplines Employees

On September 25, 2008 DISH terminated its contract with the vendor who in turn threatened to blackmail Ms. West because she had accepted the Mercedes well below cost[9]. Ms. West informed her supervisor, Eric Sahl, that she had accepted a Mercedes, below cost, from the vendor. DISH began an internal investigation.

The vendor then sued DISH for breach of contract[10] and DISH counterclaimed that the vendor had secured payment from DISH for marketing services which were never rendered or rendered at a cost that was less than the amount the vendor charged. Respondent DISH's counterclaims support Complainant's reasonable belief that the vendor was engaged in fraud and belies Respondents' assertion that the Complainant did not reasonably believe or report vendor fraud.

As a result of the DISH internal investigation, 21 employees were disciplined. This included the two supervisors who reported to Ms. West. One of those supervisors, Ms. Slowikowska was given a final warning for her role in accepting and distributing discounted gift cards provided by the vendor to DISH employees. The other supervisor was given a final warning and never returned from maternity leave.

Ms. West was let go in October. The day that Ms. West departed; Mr. Sahl explained that she had been let go, and according to witnesses, briefly outlined the reasons for Ms. West's departure, which included improperly accepting gifts from a vendor.

Complainant was let go in November of 2008. After Complainant's departure, Mr. Sahl called the South Asian marketing employees into his office. In a meeting that lasted less than 5

---

[8] Complainant alludes to this in an e-mail dated August 29, 2008 where he says, "[The vendor] was straight till the time I was monitoring her activities by the checks and balances that were in place. The day her company had a way to supersede my decisions, [she] has slacked off as you can see. I have shared with you scores of complaints from not only third parties but even our own TOP RETAILERS, yet it seems that [she] is still right in your eyes."

[9] Respondent Arora attended a marketing event the next day where the vendor was present. According to him she said, "I was made to give Tracy a Mercedes' [sic], she made me sleep with her. I though {sic} Tarun loved me. DISH made me loose [sic] $200,000 loose [sic] all my friends and sacrifice my child."

[10] On or about December 22, 2008.

minutes Mr. Sahl told the employees that Complainant was let go because management had lost faith in him. In contrast with the meeting discussing Ms. West's departure, Mr. Sahl did not say that Complainant was involved in giving or receiving improper gifts.

Ms. Slowikowska stated that it was her understanding that Complainant was let go for exercising poor judgment with respect to bringing the vendor to DISH and having a personal relationship with the vendor. Ms. Slowikowska made it clear that she did not believe Complainant had benefited by the vendor's schemes.

### DISH Denies Blacklisting Complainant

Ms. Slowikowska was asked whether she had talked with a list of people about the reasons for Complainant's departure. Ms. Slowikowska denied talking with anyone on the list outside of DISH about the Complainant much less the reasons for his departure or her views of him. With respect to internal DISH employees Ms. Slowikowska said that she may have mentioned him with respect to the proper way to conduct business or in light of the gift policy but she never said anything else[11]. This is curious since Ms. Slowikowska in her interview with OSHA said she did not believe that Complainant was involved in any aspect of the fraud.

According to some former DISH employees this was not the impression that Ms. Slowikowska left with them. They testified that Ms. Slowikowska would say things that implied Complainant was an unethical person, like "that would be a Tarun way of doing things." In addition, Respondent Arora testified that Ms. Slowikowska told him that contracting with a business that employed Complainant would require an extra layer of audit to ensure that he was not engaged in unethical business practices.

On January 1, 2009, DISH brought in Chris Kuelling to replace Ms. West as Vice President for International Programming. By this time, the only management person left in the International Department was Ms. Slowikowska. Ms. Slowikowska provided the new VP with information about how the department had functioned and with background on the "situation".

Complainant went on to get a job at SAAVN[12] , LLC ("South Asian Audio Visual Network") as

---

[11] Both Slowikowska and Arora in the course of interviews with OSHA were asked if they had spoken about Complainant with 27 different people at 18 different companies (including DISH). All of these individuals were involved in some way in the South Asian Television business. With respect to all of the people who did not work for DISH they both answered categorically no. With respect to the DISH employees, Slowikowska said she mentioned Complainant only to explain the new DISH gift policy. Arora said that he spoke with other DISH employees about what had happened. Arora was unable to recall what he had talked about with any clarity. It is not plausible that Slowikowska and Arora never discussed the Complainant with outside parties at all after what DISH's position statement claims was, "the biggest scandal in DISH's corporate history and the decimation of the International Programming Department." A former Zee TV employee said that these matters were openly discussed amongst South Asian media types at a DISH meeting in late 2008 where DISH officials were present.
[12] Saavn, LLC is a Bollywood music streaming service. As of January 2013 it reported over 10 million subscribers worldwide.

DISH Network LLC, Izabella Slowikowska and
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

a Senior Vice President of South Asian Marketing, Media and Partnerships. Complainant says
that after he left DISH he was blacklisted on at least three different occasions.

### Three Incidents Involving Blacklisting

*Incident 1 – NeoSports*

Sometime in the Spring of 2010 Nimbus Communications Limited started to look for a US "in-
country" head for a new cricket channel that it was planning to launch; the channel is known as
NeoSports. Complainant testified that he had been offered the job of "in-country" head and then
suddenly the offer was changed without an explanation. According to an official formerly
associated with Nimbus, the company asked an executive talent search agency to provide them
with names of possible candidates and one of those candidates was the Complainant here.

As part of the vetting process this same official called Christopher Kuelling VP International
Programming, DISH and asked him about the candidates.  DISH as a company has a neutral
reference policy and Mr. Kuelling was aware of that policy. It is not clear whether there had been
a prior call by someone from Nimbus to Mr. Kuelling or Respondent Slowikowska asking if they
could provide information on the candidates.  The inquiring official was in Singapore at the time
he made the call and Mr. Kuelling was located in Colorado there is a 15 hour difference between
the two locations and it would seem likely that the timing of any call would require some prior
coordination.

According to Respondent DISH's position statement Mr. Kuelling[13], "told the NeoSports
representative that he knew the other candidate and provided a positive recommendation of that
candidate."  In testimony here, Mr. Kuelling elaborated that he did not say anything about
Complainant except that he had been involved in sales and the other candidate had been involved
in running a channel before.

The inquiring official said that Mr. Kuelling had positive things to say about the other candidate
and labeled Complainant "pushy and aggressive".  The inquiring official understood that Mr.
Kuelling preferred the other candidate and reported to Nimbus that Complainant should be the
second choice.  This is a different conversation than the one reported by Mr. Kuelling and
indicates that he did not following DISH's neutral reference policy.  According to both parties
there was one conversation between them.

DISH's South Asian Marketing Manager who took over after Complainant left has a different
memory of what happened.  He believes that Nimbus informed Mr. Kuelling or Ms.
Slowikowska that it was considering Complainant for the job of "in-country" head.  He says that

---

[13] Initially the position statement said that Mr. Kuelling "did not know the Complainant… " This is not a true
statement. Respondents' attorney told this office that the statement was the result of a misunderstanding between
the attorney and Mr. Kuelling.

Mr. Kuelling mentioned the call to Ms. Slowikowska and him while they were discussing other issues in Mr. Kuelling's office.

The former Marketing Manager said that Ms. Slowikowska was highly critical of Complainant and said that she did not believe Complainant should get the job with NeoSports.

In mid to late 2010 Complainant began to hear rumors that Ms. Slowikowska had blacklisted him. As a result on October 31, 2010 he wrote an e-mail to Stephen Wood and Jim Hankins at DISH outlining in broad terms that he believed DISH was blacklisting him and Ms. Slowikowska was behind the blacklisting. Mr. Wood responded that he and Mr. Hankins would review the matter. Complainant didn't know he was blacklisted until March 1, 2011.

*Incident 2 – Refusal to do business with SAAVN*

Mr. Kuelling said that sometime in late 2010 or the beginning of 2011 he was contacted by a woman who worked for SAAVN to talk about DISH placing advertising on SAAVN. He believes that he asked Respondent Arora to get in touch with her. In an email dated March 1, 2011, from Mr. Arora to the SAAVN employee, Mr. Arora wrote, "[t]he direction internally at this time is not to work with Saavn [sic], I can elaborate on the phone if you would like me to." That same day Mr. Arora spoke with the SAAVN employee by phone and her supervisor, SAAVN's sales manager; he said that DISH would not do business with SAAVN while Complainant worked there. Mr. Arora said that he had received those instructions from management. The conversation was recorded and Mr. Arora does not dispute that he did have the conversation and that those were his words. In his conversation with the SAAVN employees he said, "that is something for which I will not get approvals, if I even think of doing it."

Mr. Arora elaborated by saying that either Respondent Slowikowska or Mr. Kuelling or both had told him that doing business with Complainant would result in additional paperwork and vigilance because of Complainant's prior "unethical behavior." They did not prohibit him outright from doing business with a company that employed Complainant. Respondent Arora's statement to OSHA was forcefully delivered when he talked about avoiding doing business with Complaint because of Complainant's prior unethical behavior.

Mr. Arora stated that he had never seen the Complainant do anything that Mr. Arora considered unethical while the two of them worked together. When asked why he stated his belief that Complainant was unethical so strongly, Mr. Arora said that he based his belief on Eric Sahl's statement made in November of 2008 that DISH had lost faith in the Complainant. Mr. Arora denied that Ms. Slowikowska or any other DISH manager ever discussed Complainant except in the context of how to comply with DISH gift regulations.

Mr. Kuelling stated that DISH's policy at the time was not to do business with companies employing either Ms. West or Complainant unless their business offered DISH something that it could not get elsewhere. He gave as an example the contract that DISH signed with NeuLion, a

white label internet service provider, while Ms. West worked at that company. In contrast, he said that SAAVN offered a space for DISH publicity and that many companies offered space for publicity.

### Incident 3 – Carriage of 9X

In November of 2010 the Bollywood channel 9X approached SAAVN asking them to get the channel on DISH satellite television. In March of the following year, Complainant approached DISH with the same channel. DISH said that it would study the feasibility of putting 9X on their satellite. This analysis involved looking at the expected revenue to be generated by the channel and DISH's costs as well as whether or not the channel content was already on DISH and the amount of space available on the satellite.

According to Mr. Kuelling, he asked both Respondents Arora and Slowikowska their opinions about the channel.

Mr. Arora stated that this was not the first time he had been asked to offer an opinion about 9X. Sometime in late 2010, while he was working as a marketer, he received a request from a party to carry 9X on DISH's satellite. Whoever made the request it was not SAAVN. Mr. Arora said that based on his analysis of the market at the time he told the party that DISH would not be interested in carrying the channel. Respondent DISH produced no documents supporting this statement.

Mr. Arora received a second request to review 9X from Mr. Kuelling; Mr. Arora did not know that it came from SAAVN and Complainant. At some point after starting his analysis, Mr. Kuelling informed Arora that the proposal came from the Complainant.

Mr. Arora said that he analyzed the channel and produced a report saying that DISH should not carry the channel. During his interview with this OSHA, Mr. Arora testified that he had sent a copy of his analysis by e-mail to Mr. Kuelling or had given him a copy. When Mr. Arora was told that no report was produced by DISH in response to the Department of Labor's document request, Mr. Arora said he believed that it could have been an e-mail without attachments. He then said that there would have been a conversation and maybe an e-mail or it could have been either or both. DISH produced no documents that contained Mr. Arora's analysis or conclusion.

Ms. Slowikowska stated that she was surprised that Complainant was asking DISH to put up a channel, "given the previous relationships he had and how abruptly everything ended." In her discussion with Mr. Kuelling, she queried whether DISH would be interested because of Complainant's prior unethical behavior and the poor judgment. Mr. Kuelling told her to leave the matter to him. He decided not to acquire the channel.

DISH Network LLC, Izabella Slowikowska and
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

## DISH Deliberately Blacklisted Complainant

Complainant engaged in protected activity by reporting vendor fraud; his actions brought to light behavior by former and current DISH employees that Complainant reasonably believed was improper.  In all 21 employees were disciplined by DISH for improperly taking gifts from a vendor. The vendor filed suit against DISH for breach of contract and DISH answered and counterclaimed.  One of the counterclaims tracked Complainant's initial report of improper invoicing.

Complainant was asked by DISH to cooperate in on-going litigation.  He provided deposition testimony that discussed the involvement of current and former DISH employees in wrongdoing.  Respondent's assertion that Complainant did not have a reasonable belief of vendor fraud is frivolous and is undercut by Respondent DISH's own counterclaim against the vendor.

All Respondents are and were aware of Complainant's protected activity with respect to the invoices and Respondent DISH was aware of his activities at all levels.  It is undisputed that current DISH employees were aware that the former vendor and DISH were involved in a legal dispute.

DISH maintains that the employees directly involved in the alleged blacklisting did not understand that there was on-going litigation and never knew that Complainant had been deposed much less what he said about them.  Therefore, they maintain that there is no employer knowledge and the complaint is meritless.

However, Complainant has shown that there were at least two protected activities and there is no dispute that the Respondents here were aware of the first activity, Complainant's report of vendor fraud.

With respect to the second protected activity, deposition testimony, there is no question that DISH and the Respondents were aware that there were on-going legal proceedings regardless of whether or not they understood it to be litigation.  However, Respondent Slowikowska's claim that she was unaware that there was litigation is unbelievable because one of her former employees stated that both Ms. Slowikowska and he were specifically informed that the vendor had filed a suit against DISH.  The person who informed them was Respondent Slowikowska's boss at the time, Mr. Sahl.

Ms. Slowikowska also denies that she knew of the deposition.  However, on October 31, 2010, Complainant wrote the appropriate DISH officials to tell them that he believed that Respondent Ms. Slowikowska was deliberately blacklisting him as a result of his deposition testimony.  As part of their due diligence activities these officials ought to have made the proper inquiries, thus notifying Ms. Slowikowska.  Complainant has shown employer knowledge and Respondent has not clearly and convincingly shown that there was no knowledge.

DISH Network LLC, Izabella Slowikowska and                    **Page 11 of 15**
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

The adverse action alleged here is that Respondents blacklisted Complainant.  "The ARB has stated that blacklisting is the "quintessential discrimination," often "insidious and invidious [and not] easily discerned." [citations omitted]…   The Secretary stated in *Earwood v. Dart Container Corp.*, Case No. 93-STA-16, slip op. at 5 (Sec'y Dec. 7, 1994) that "effective enforcement of the Act requires a prophylactic rule prohibiting improper references to an employee's protected activity whether or not the employee has suffered damages or loss of employment opportunities as a result." *David Pickett v. Tennessee Valley Authority*, ARB Case Nos. 00-56, 00-59, ALJ Case No. 01-CAA-18, ppg. 9-10 (November 28, 2003)

In order to show blacklisting the Complainant has to show by a preponderance of the evidence that the specific blacklisting occurred and that the actions taken by Respondents were motivated at least in part by Complainant's protected activity.  *David Pickett v. Tennessee Valley Authority*, ARB Case Nos. 00-56, 00-59, ALJ Case No. 01-CAA-18, ppg. 9-10 (November 28, 2003)

There is no question that the three events outlined above took place, meeting the first element of the test[14].

The second element requires Complainant to show by a preponderance of the evidence that the Respondents' actions were motivated at least in part by Complainant's protected activities. Complainant has demonstrated that Respondent Slowikowska harbors animus towards him. That animus appears to have arisen out of his first protected activity and Respondent Slowikowska's intimate involvement with aspects of what happened.  In contemporaneous e-mails Complainant specifically asked her why she was upset with him. Ms. Slowikowska acknowledged that at the time she was upset with the Complainant and the vendor. Ms. Slowikowska called the "situation" between the two unbearable.

Additionally, Ms. Slowikowska was involved in the fraud.  In addition to accepting discounted gift cards, she helped take orders for the gift cards; she made sure that they were distributed and she was involved in collecting money from DISH employees to send back to the vendor. Further, she was involved in what appears to have been an attempt by Ms. West to cover-up the improper invoice payments highlighted by Complainant. Ms. Slowikowska was disciplined by

---

[14] The complaint here was timely filed with this office with respect to all three incidents because Complainant did not have actual knowledge of the blacklisting until the recording of the conversation was made with Respondent Arora on March 1, 2011.  Blacklisting is invidious and insidious.  Although Complainant may have suspected that he was being blacklisted it was not until the March 1, 2011 that he received actual notice that Respondent was engaged in blacklisting him.  In an analogous situation, *Poll v. Jacobs Engineering Group*, ARB Case No. 11-051, ALJ Case No. 2011-SOX-027 (August 31, 2012), the ARB ruled that Complainant's time to file did not begin to run until the Complainant had clear and unequivocal knowledge that he was being let go.

DISH Network LLC, Izabella Slowikowska and                    Page 12 of 15
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

DISH for her role in the fraud.

The animus on the part of Respondent Slowikowska, combined with Mr. Kuelling's statements
echoed by Respondent Arora that DISH would not do business with any company employing
Complainant, is blacklisting since Respondents' actions were motivated at least in part by
Complainant's protected activity.

Respondents in order to prevail must show by clear and convincing evidence that they would
have engaged in the same activity even if Complainant had not engaged in protected activity.

With respect to the possible job at NeoSports, Respondent presented no evidence that
Complainant's protected activity did not influence its actions.  In fact, DISH's neutral
recommendation policy indicates that Mr. Kuelling should not have provided the negative
information about Complainant to Nimbus.  Respondent produced no evidence regarding why
the deviation took place and at one point attempted to deny a deviation had occurred.

Respondent Arora was taped saying that Respondent DISH would not do business with SAAVN
while Complainant was employed there.  Mr. Kuelling said that that was official policy with
respect to both Complainant and Ms. West.  However, he reserved the right to do business with a
company that employed either of them if that company had a product or service that was
unavailable elsewhere (unique).  This was DISH's justification for doing business with NeuLion
while Ms. West was employed there.

Respondent DISH's argument is not clear and convincing for three reasons; first, by definition
the space offered by SAAVN is a unique space currently with over 10 million subscribers and 1
million Bollywood music tracks in its library.   Second, Mr. Kuelling's credibility was
impeached by another witness produced by DISH.  This witness said that he recalled 1) that Mr.
Kuelling had called Complainant "pushy and aggressive" and 2) that Mr. Kuelling left the
witness with the impression that the other candidate was better than Complainant.  Finally,
Respondent Slowikowska's animus towards Complainant came in to play here when she told
Respondent Arora that if he decided to place ads with SAAVN he would be required to go
through an extra layer of audit.  He said Ms. Slowikowska told him that this additional work was
due to Complainant's prior unethical business conduct.

With respect to 9X there is some evidence that Respondent Arora may have reached the same
conclusions that 9X should not be carried on DISH satellite regardless of Complainant's
protected activity.  However, in the course of Mr. Arora's interview he mentioned that he usually
produced written reports containing his analysis and added that he sent or gave such a report to
Mr. Kuelling.  When OSHA asked why that report had not been produced as requested
Respondent Arora back tracked and said he could no longer remember whether or not he had
actually produced such a report in this case.  Mr. Arora also then became unclear about how he
had reported the results of his analysis to Mr. Kuelling.  In addition, Respondent Slowikowska
stated that she had raised the issues of Complainant's prior association with DISH as a reason not

DISH Network LLC, Izabella Slowikowska and                    **Page 13 of 15**
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

to carry the channel.

Complainant has shown that he was blacklisted on at least three different occasions and
Respondents DISH, Slowikowska and Arora have not been able to show clearly and
convincingly that absent Complainant's protected activities they would have engaged in the same
behavior.

### Order

Upon Receipt of the Secretary's Findings and Order:

Respondent DISH's blacklisting negatively affected Complainant's ability to earn wages
commensurate with what he would have earned absent Respondent's blacklisting. Respondent
DISH shall pay Complainant lost wages in the amount of $157,024.71 including interest.

Respondent DISH will file with the Social Security Administration all forms necessary to ensure
that the Complainant is properly credited for the months of service that he would have earned
absent Respondent DISH's adverse action. Respondent DISH's report will allocate the backpay
award to the appropriate calendar month(s) in which Complainant would have earned the
compensation.

Respondent DISH shall pay Complainant compensatory damages in the amount of $100,000, for
the following:

- Emotional Distress
- Loss of Reputation

Respondent DISH shall pay all reasonable attorney's fees.

Respondent DISH shall expunge Complainant's employment records of any reference to the
exercise of his rights under SOX.

Respondent DISH shall not retaliate or discriminate against Complainant in any manner for
instituting or causing to be instituted any proceeding under or related to SOX.

Respondent DISH  shall post immediately in a conspicuous place, including all places where
notices for employees are customarily posted, including Respondent's internal website for
employees or emails, if Respondent DISH customarily uses one or more of these electronic
methods for communicating with employees, and maintain for a period of at least 60 consecutive
days form the date of posting, the attached notice to employees, to be signed by a responsible
official of Respondent and the date of actual posting to be shown thereon.

Respondent and Complainant have 30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge (ALJ). If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with:

Chief Administrative Law Judge Office of Administrative Law Judges
U.S. Department of Labor 800 K Street NW,
Suite 400 North Washington, D.C. 20001-8002
Telephone: (202) 693-7300
Fax: (202) 693-7365
With copies to:

Russell Bogart
Hoffman Polland & Furman PLLC
220 East 42nd Street, Suite 435
New York, New York 10017

Regional Administrator
U.S. Department of Labor-OSHA
201 Varick Street Room 670
New York, NY 10014

Department of Labor, Associate Solicitor
Division of Fair Labor Standards
200 Constitution Avenue, NW, N2716
Washington, D.C. 20210

DISH Network LLC, Izabella Slowikowska and          **Page 15 of 15**
Vikas Arora/Tarun Kshetrepal/2-4173-11-132

In addition, please be advised that the U.S. Department of Labor does not represent any
complainant or respondent in the hearing; rather, each party presents his or her own case.
However, in STAA cases, OSHA, represented by the Regional Solicitor, usually appears
in cases in which merit findings have been issued. The complainant and the respondent
may also appear in those cases. The hearing is an adversarial proceeding before an
Administrative Law Judge (ALJ) in which the parties are allowed an opportunity to
present their evidence for the record. The ALJ who conducts the hearing will issue a
decision based on the evidence and arguments presented by the parties. Review of the
ALJ's decision may be sought from the Administrative Review Board, to which the
Secretary of Labor has delegated responsibility for issuing final agency decisions under
SOX.  A copy of this letter has been sent to the Chief Administrative Law Judge along with a
copy of your complaint. The rules and procedures for the handling of SOX cases can be found in
Title 29, Code of Federal Regulations Part 1980, and may be obtained at
www.whistleblowers.gov.

Sincerely,

Robert D. Kulick
Regional Administrator

cc:
Russell Bogart, Esq.
Cert. Mail #7013 0600 0001 7778 0900, RRR)

U.S. Securities and Exchange Commission
U.S. DOL-Fair Labor Standards
U.S. DOL-Chief Administrative Law Judge
DWPP




# NOTICE TO EMPLOYEES

## PURSUANT TO AN ORDER BY THE U.S. DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION:

DISH Network LLC (DISH) has been ordered to make whole one employee who was blacklisted for exercising his rights under under 18 U.S.C. §1514A (SOX). DISH has also been ordered to take affirmative action to ensure the rights of its employees under employee whistleblower protection statutes including SOX.

## PURSUANT TO THAT ORDER, DISH NETWORK, LLC AGREES THAT IT WILL NOT:

1. The employer agrees that it will not discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to SOX or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this act.

2. The employer agrees that it will not advise employees against exercising rights guaranteed under SOX, such as contacting, speaking with, or cooperating with Occupational Safety And Health Administration (OSHA) officials either during the conduct of a safety-health inspection of the employer's facilities or in the course of an investigation.

3. The employer agrees that it will not intimidate employees by suggesting or threatening that employee contact, conversation, or cooperation with OSHA officials might result in closure of the employer's facilities, in loss of employment for the employees, or in civil legal action being taken against the employees.

_____          _____

DISH Network LLC                                                    Date

THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE. THIS NOTICE MUST REMAIN POSTED AND MUST BE NOT ALTERED, DEFACED, OR COVERED BY OTHER MATERIAL.



OSHA — Occupational Safety and Health Administration

www.osha.gov