UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

TARUN KSHETRAPAL,

                *Plaintiff,*

     -against-

DISH NETWORK, LLC, VIKAS ARORA, and
IZABELA SLOWIKOWSKA

              *Defendants.*

------------------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/23/18

14-cv-3527 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

       Plaintiff Tarun Kshetrapal brings this action against his former employer Dish Network LLC ("Dish Network") and two Dish Network employees, Izabela Slowikowska and Vikas Arora (collectively "Defendants"). Plaintiff alleges: (1) violations of the Sarbanes-Oxley Act ("SOX"), (2) tortious interference with business relations, and (3) defamation. Defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff moves for partial summary judgment and to exclude improper evidence. For the reasons set forth below, Defendant's motion for summary judgment is GRANTED, and Plaintiff's motions are DENIED.

## BACKGROUND

       From March 2007 through November 2008, Plaintiff was employed as the Associate Director of South Asian Marketing for Dish Network, a satellite television broadcasting company. Pl. Counter 56.1 ¶¶ 1-3. His responsibilities consisted of marketing Dish Network's South Asian television channels. *Id.* ¶ 4.

       During his employment with Dish Network, Plaintiff reported to non-party Tracy Thompson West, Vice President for International Programming. *Id.* ¶ 5. Soon after Plaintiff

started working at Dish Network, West asked Plaintiff to suggest marketing companies to replace the vendor that West recently fired for providing false logs and affidavits. *Id.* ¶ 28. One of the companies whose names Plaintiff provided was the marketing agency Aman Entertainment, Inc. d/b/a Dreamakers ("Dreamakers"), operated by Sona Patel (also known as Jalpa Kalaria). *Id.* ¶¶ 16, 28. At the time, Plaintiff had known Patel for over three years through his previous employment at Zee TV, a South Asian television channel. *Id.* ¶ 23; Def.'s Ex. 17 (9/28/08 e-mail from Plaintiff to West and Eric Sahl).

In May 2007, West chose to retain Dreamakers to provide grassroots marketing services such as concerts. Pl. Counter 56.1 ¶¶ 17, 30. This work gave Plaintiff and Patel many opportunities to interact, and Patel quickly began to display romantic interest in Plaintiff. Def's Ex. 17. She proclaimed her personal interest in Plaintiff in front of his colleagues, and she took the initiative to meet his parents and sister several times in New Jersey. *Id.* Previously, in 2006, Patel borrowed $8,000 from Plaintiff's parents while in India. Pl. Counter 56.1 ¶¶ 26-27. In July 2007, Plaintiff learned that Patel was married, and he informed her that he "felt cheated and let down." Def.'s Ex. 17. Nevertheless, Plaintiff and Patel continued working together, and Dish network expanded its relationship with Dreamakers in January 2008, entering into a six-month exclusive agreement for Dreamakers to act as Dish Network's marketing agent in the South Asian market. *Id.*; Pl. Counter 56.1 ¶ 44.

Throughout 2008, Plaintiff's relationship with Patel deteriorated, and Patel began subjecting Plaintiff to explosive outbursts, which interfered with Plaintiff's work. For example, in June 2008, Patel e-mailed Plaintiff stating, "you have turned off your phone, now see if I ever answer your phone, just see. I will kill myself due to the stress you have caused me." Pl. Counter 56.1 ¶ 52. On July 17, 2008, West participated in a phone call between Plaintiff and

Patel and provided guidance for future communications. *Id.* ¶ 62. Nevertheless, in August 2008, Plaintiff and Patel experienced another dispute over a press release. Def.'s Ex. 37-38 (8/21/08 e-mail chains). On August 21, 2008, West complained to Plaintiff that "[w]e are all spending too much time on the drama," and informed him that "[y]ou are running the business and need to make a decision on whether you can work like this long term." Def.'s Ex. 37. In response, Plaintiff e-mailed West and Defendant Izabela Slowikowska, General Manager of Programming for Dish Network's International Department, to apologize for letting personal issues interfere with his work:

> I will try and reduce this drama and concentrate on getting my work done. I am dedicated to my work and I will continue to work as hard as I can. I never bring my personal issues into my work and it will be my sincerest endeavor to keep this separate whereby I have requested Sona [Patel] to do courtesy projects for DISH due to my friendship with her. I apologize to you and Izabela [Slowikowska] for all the stress I have caused.

> *Id.*

At the same time, however, Plaintiff directed his team to check various websites to see whether Dreamakers was fulfilling its obligations in placing Dish Network's online advertising. Pl. Counter 56.1 ¶ 72. They reported to Plaintiff that virtually none of the advertising had been done. *Id.*; Pl.'s Ex. 53, 54, 55, 58. Plaintiff relayed this finding to West and Slowikowska, and West directed Slowikoska to speak with Patel about the online advertising and procedures to be followed. *Id.* ¶ 73; Def.'s Ex. 43 (8/28/08 e-mail chain).

On August 28, 2008, Slowikowska reported that she met with Patel in New York City, looked through online reports showing that online advertisements had been placed, and spoke with several online vendors to confirm the price and length of advertising. *Id.* ¶ 74; Def.'s Ex. 43. Plaintiff responded that if Slowikowska saw the advertisements, they must have been put on the day before, and he attached a report. Pl.'s Ex. 60 (8/28/08 e-mail from Plaintiff to

Slowikoska and West). He also requested that Dreamakers no longer perform online advertising. Def.'s Ex. 43 (8/28/08 e-mail from Plaintiff to Slowikowska and West). The next morning, West responded:

> I trust what Izabela is telling me that she said and went through Pooja's e-mails and saw the proof of the online. Enough of this drama. Yesterday I gave you the choice of whether you wanted [Patel] as an agency or not. You said you did and the drama still continues. This is absolutely absurd.

Pl.'s Ex. 60. The following day, Plaintiff wrote West, "I just got back from our meeting with Sona [Patel] and Izabela [Slowikowska]. I am happy to say things seem back on track and I intend to keep it that way to prevent the episodes that you and Izabela had been subject to last week." Pl. Counter 56.1 ¶ 81; Def.'s Ex. 45.

On September 24, 2008, Plaintiff sent West an e-mail informing her that Patel had demanded that he quit Dish Network:

> Sona [Patel] had demanded that I come to New York today to show her that she is more important than DISH Network. She has demanded that I quit DISH Network in order to come to New York and work with her. She has offered to pay double the salary to me if I join Dreamakers. I am sure Izabela has told you about this as she was in the car with me when the offer was made. As you can see that I have chosen to be at work and stay with DISH Network, Sona is becoming vindictive.

Pl. Counter 56.1 ¶ 88; Def.'s Ex. 28 (9/24/08 e-mail from Plaintiff to West). After receiving this e-mail, West informed Patel that Dish Network was ending its relationship with Dreamakers and directed Patel to consult with Slowikowska regarding the transition. Pl. Counter 56.1 ¶¶ 89-90; Pl.'s Exs. 22 (9/29/08 e-mail from West to Compliance recounting events), 101 (9/25/08 e-mail from West to Patel). The next day, Patel lashed out at Plaintiff, sending him threatening e-mails:

> [Y]ou have decided not to take my calls. I will destroy your career. I just spoke to Tracy and she will have to fire you. You decided not to join my company and now you will not have a job. I will make sure of that. Now you see what I will do to your parents and sister. I will get her raped and you cant [sic] do anything sitting in Denver. Dish can never kick me outand your vp will tell you why. I have paid $87,000 for her car and no one will believe her that her car cost only $20,000. Its

[sic] a Mercedes. She did not even know how to drive it and I was born with one. W[h]at will charlie do. I will will [sic] bring him to his knees too. You just see what I do you that polish Izabela. [sic] I have polish maids and she thought she could compete with me. I will destroy everyone just you see.

Pl. Counter 56.1 ¶ 91. That evening, Plaintiff informed West that Patel had been threatening him and showed her another e-mail from August 22, 2008, in which Patel stated, "I have already done a lot for your VP and she is in my pocket. I can have you fired in the snap of a finger." Pl. Counter 56.1 ¶ 94; Def.'s Ex. 31 (8/22/08 e-mail from Patel to Plaintiff). The following morning, Slowikowska spoke with Patel, and Patel told Slowikowska that Dreamakers could not be terminated because Patel had done a lot of things for Dish Network, including purchasing a Mercedes Benz automobile for West. Pl. Counter 56.1 ¶ 95. Slowikowska immediately informed West of her conversation with Patel. *Id.*

Later that morning, September 26, 2008, West contacted her supervisor, Eric Sahl, to inform him of the circumstances surrounding her purchase of a Mercedes Benz through a referral from Patel. *Id.* ¶ 98. According to West, Patel asked her in April if she was interested in receiving a car at a discount, as Patel received two free cars and several discounted cars per year due to her family's medical business. Pl.'s Ex. 22 (9/29/08 e-mail from West to Compliance recounting events). West accepted the offer, was informed in June 2008 that her car would cost $12,000, and received the car on September 19, 2008. *Id.* West claimed that Patel repeatedly insisted that she was not paying the dealership any money directly to offset West's discount. In fact, Patel had written a check to the dealership for $64,000. *Id.* West claimed that she did not know that Patel had paid the dealership directly until West decided to call and ask the dealership that morning, after Plaintiff had showed her the August 22, 2008 e-mail and Slowikowska had informed West of her conversation with Patel. *Id.*

As a result of West's disclosure, Dish Network directed Jim Hankins, the Director of Compliance, to conduct an internal investigation into Dish Network's relationship with Dreamakers. Pl. Counter 56.1 ¶ 99. During the investigation, Hankins discovered that Patel had provided two Rolex watches to West in addition to the discounted Mercedes Benz. *Id.* ¶ 102. It was also discovered that Patel provided a number of lesser benefits to West, Slowikowska, and other employees in the form of discounted gift cards, gas cards, travel upgrades, dinners, and transportation. *Id.* For example, Patel informed West and Slowikowska that she had access to free airline upgrades through a travel agent affiliation, and West and Slowikowska often booked both business and personal travel through Patel's agency. *Id.* ¶¶ 39-40. Although Plaintiff purchased 20-50 discounted gift cards from Slowikowska, who had received them from Patel, he did not receive any benefits directly from Patel. *Id.* ¶ 38; Def.'s Ex. 18 (10/23/08 e-mail from Plaintiff to Hankins); Pl.'s Dep. 425:13-427:24.

The investigation resulted in the following findings: (1) Patel, an unethical vendor, took advantage of Plaintiff and Dish Network; (2) Plaintiff had a "clear conflict of interest" with Patel; (3) West should not have accepted the various gifts from Patel, allowed the conflict of interest to develop, or permitted Patel to provide gifts to the employees in her department; and (4) Dreamakers invoiced Dish Network for services that were not performed, as Plaintiff had suspected. Pl. Counter 56.1 ¶ 110; Hankins Decl. Ex. A (11/3/08 investigation findings). In October 2008, Dish Network fired West and issued a written consultation to Slowikowska. Pl. Counter 56.1 ¶¶ 112, 129. In November 2008, Dish Network forced Plaintiff to resign. *Id.* ¶ 120.

In December 2008, Dreamakers filed a breach of contract action against Disk Network seeking approximately $800,000 in unpaid invoices ("Dreamakers Lawsuit"). *Id.* ¶ 145. In

defending against the Dreamakers Lawsuit, Dish Network filed counterclaims alleging that it did not owe Dreamakers because Dreamakers had either not performed the services or engaged in fraud against Dish Network. *Id.* ¶ 146.[1] Plaintiff was deposed in the Dreamakers Lawsuit on November 12, 2009. There, he testified that he reported Dreamakers' misconduct, such as their failure to perform marketing services, to West and Slowikowska, but they "repeatedly overruled" his complaints. Pl. Corrected 56.1 ¶ 310. He also testified that Slowikowska instructed him to fabricate purchase orders and that he heard from Patel that Slowikowska also asked Patel for help in obtaining a discounted car. *Id.*

In January 2009, Plaintiff obtained a job as Senior Vice President of South Asian Marketing with South Asian Audio Visual Network LLC ("SAAVN"), a Bollywood music streaming service. Pl. Counter 56.1 ¶ 155; Compl. ¶¶ 64-65. In April 2010, while Plaintiff was employed with SAAVN, a recruiting agency contacted him regarding an opportunity at Nimbus Communications ("Nimbus"), headquartered outside the United States. Pl. Counter 56.1 ¶ 197. Nimbus was planning to launch a channel called NeoSports in the United States and was seeking candidates to serve as the in-country head of operations. *Id.* ¶ 198; Krishnan Tr. 41:5-12, 127:24–128:4. After soliciting scores of resumes and doing its own due diligence, the recruiting agency recommended three candidates to Nimbus for interviews in New York: (1) Plaintiff; (2) Sivaramakrishnan Venkatasubramanian ("Venkat"); and (3) Karamjit Nandah. Pl. Counter 56.1 ¶ 200. Prior to working with Dish Network, Plaintiff had worked for Venkat in marketing at Zee TV, where Venkat had been CEO of the channel's U.S. Operations. *Id.* ¶ 201-02. On May 5, 2010, Nimbus Chairman Harish Thawani interviewed all three candidates. *Id.* ¶ 204. Afterward, Digvijay Singh ("D. Singh"), who had previously been on the Board of Nimbus and was at that

---

[1] The Dreamakers Lawsuit was dismissed by consent of the parties on July 6, 2010. *Aman Entm't, d/b/a Dreamakers v. Echostar Satellite d/b/a Dish Network*, No. 09-cv-878, Dkt. 91 (D. Colo. July 6, 2010).

time a consultant to Nimbus, was tasked with reaching out to his contacts in the United States to seek opinions on the three candidates. *Id.* ¶ 205.

One of the people that D. Singh contacted was Chris Kuelling, whom Dish Network appointed in January 2009 to replace West as Vice President for International Programming. *Id.* ¶ 131. D. Singh spoke to Kuelling on May 18, 2010. *Id.* ¶ 207. During the conversation, Kuelling indicated that Venkat was the best candidate and that Plaintiff was younger, aggressive and pushy in terms of selling and marketing, and had no business head experience comparable to Venkat. D. Singh DOL Tr. 21:3-9; 1/13/16 Kuelling Tr. 137:8–140:2. Later that day, D. Singh reported to the COO of NeoSports, Prasana Krishnan, and told him what Kuelling had said. D. Singh DOL Tr. 31:11-15; Krishnan Tr. 32:17–33:19.

On May 31, 2010, Plaintiff received an e-mail from the recruiting agency stating that "Neo has decided to make you an offer and I want to discuss it with you before they formally make it." Krishnan Ex. 3 (5/31/10 e-mail to Plaintiff). On June 14, 2010, Plaintiff received a signed offer letter from Nimbus offering him a position as a "consultant." Def.'s Ex. 2 (6/14/10 offer letter). Several days later, Plaintiff sent back a mark-up of Nimbus's offer letter reflecting his significant concerns, which included: (1) being hired as a consultant; (2) having a probationary period; (3) not having immediate healthcare benefits; (4) wanting a guarantee of business class air travel and three star hotels; and (5) wanting six months of severance. Pl. Counter 56.1 ¶ 221; Def.'s Ex. 5 (Plaintiff's counteroffer letter). On June 18, 2010, Nimbus sent Plaintiff a revised signed offer letter addressing some of the concerns raised by Plaintiff. Pl. Counter 56.1 ¶ 222. Plaintiff was not satisfied with the terms of the revised offer letter and did not sign it. *Id.* 223. Instead, on June 21, 2010, he sent an e-mail to Nimbus Human Resources identifying in detail eighteen issues that he had with the revised offer. *Id.* The following day,

Krishnan met with Venkat and Plaintiff in New Jersey, where Plaintiff reiterated that he needed to be an employee, have a higher salary, and have a higher severance agreement. *Id.* ¶ 225-26. Later that evening, Nimbus Human Resources sent Plaintiff an e-mail stating that Nimbus "would not be in a position to make an offer currently" because "it is difficult to accommodate your expectations with regards to the salary and contractual terms." *Id.* ¶ 229; Def.'s Ex. 7 (6/22/10 e-mail rescinding offer).

At some point during this process in June 2010, Venkat was offered and accepted the position of in-country head, which became referred to as President of Neo Broadcast America. Pl. Counter ¶ 56.1 216, 218; Krishnan Tr. 43:13-17, 151:20–152:12. In late 2011, Neo exited the American market, and Venkat left Neo on November 30, 2011. Venkat Tr. 82:7-18.

In November 2010, Plaintiff sought another position at Star TV. Def. Counter 56.1 ¶ 477. Upon hearing that he would not get the position, Plaintiff e-mailed Star TV's director of advertising sales, Monica Sadhu, pontificating, "I knew that [Star TV] would not consider me as no one like a whistle blower in their company. I decided to stick to the truth and now I am paying the price. I am sure I will have a long conversation with GOD soon because I did the right thing and yet GOD himself did not protect me." Gillette Decl. Ex. 47 (e-mail chain between Plaintiff and Sadhu ending 12/6/10). Two months later, Star TV terminated the person that was initially hired for the position that Plaintiff sought, but Plaintiff never received an offer from Star TV to fill that position. Def. Counter 56.1 ¶¶ 482-84.

Around this time, Plaintiff also e-mailed Hankins at Dish Network to express his concern that Slowikowska was telling South Asian businesses that Dish Network would not do business with companies that worked with him. Bogart Decl. Ex. 9 (e-mail chain ending 11/5/10). Hankins forwarded the e-mail to others and suggested that he would meet with Kuelling to

discuss Slowikowska. *Id.* Plaintiff continued e-mailing Hankins about this issue until at least February 2, 2011. Def. Counter 56.1 ¶ 323. In one e-mail, Plaintiff blamed Dish Network for Star TV not hiring him. Bogart Decl. Ex. 6 (1/28/11 e-mail). Plaintiff also requested that Dish Network re-hire him. *Id.* (12/29/10 e-mail). Hankins concluded that Dish Network was not threatening his livelihood, and Dish Network declined to re-hire him. Def. Counter 56.1 ¶ 320. Instead, Plaintiff continued to work at SAAVN, as he had since January 2009.

In January 2011, Meg Paintal, a sales person at SAAVN, approached Dish Network about a potential marketing and advertising relationship. Pl.'s Ex. 72 (e-mail chain ending 1/14/2011). Specifically, she reached out to Kuelling and Defendant Vikas Arora, a manager of International Programming. *Id.* Arora previously worked as a marketing coordinator under Plaintiff. Pl. Counter 56.1 ¶ 7. Kuelling responded to Paintal's e-mail by directing either Arora or Slowikowska to engage with SAAVN. Pl.'s Ex. 72. Over the following weeks, Paintal and Arora engaged in discussions regarding SAAVN's proposal. Pl.'s Ex. 73 (e-mail chain ending 2/22/11).

On March 1, 2011, Arora sent an e-mail to Paintal stating, "The direction internally at this time is not to work with Saavn, I can elaborate on the phone if you would like me to." Pl.'s Ex. 74. Paintal called Arora, and Arora provided the following explanations:

> So I was just checking with my management internally and see if we can work with you guys...they still have...they are not very sure if they want to work with a company where one of our ex-employees is and its sad but it's the case right now. . . .

> ah, quite honestly I don't know, I think it's just a conflict of interest. The person left on not the best of terms and they just asked us not to work with Saavn if possible and I think right now there's a… its just something which we can do without and it would be nice to be working with you guys because I think its just its easier for us not to because Management is not very keen for us to work with you guys because I think it is something which I would not get approvals for even if I think of doing it. . . .

No, there is nothing much you can say about it. It sucks…its pretty sad the way it is. So, hopefully, thing will change …some people will get involved and lets see how things work out. That's all. Its something we didn't get approvals for. I checked internally they like that… we shouldn't be working with you guys so that all I can say.

Def. Counter 56.1 ¶¶ 381-82; Pl. Decl. ¶ 9 ("SAAVN call"). Unbeknownst to Arora, Plaintiff was in the room with Paintal and recorded the SAAVN call. Pl. Counter 56.1 ¶ 172. The following day, Plaintiff e-mailed Hankins at Dish Network to complain about the SAAVN call. Bogart Decl. Ex. 11 (3/2/11 e-mail from Plaintiff to Hankins). Plaintiff accused Slowikowska of orchestrating it, expressed his fear that SAAVN would fire him, and threatened a lawsuit "to get me justice and more importantly to let me live and work without this constant and daily threat from DISH Network employees." *Id.*

Less than two weeks after threatening litigation, however, Plaintiff reached out to Kuelling to pitch 9X, a Bollywood music channel, for inclusion in Dish Network's South Asian programming packages that were carried on a single international programming satellite. Pl. Counter 56.1 ¶ 177. 9X had retained SAAVN to find a cable or satellite distribution deal for the U.S. market. *Id.* ¶ 178. On March 29, 2011, Kuelling informed Plaintiff that "it would be unlikely that we could allocate a channel of satellite bandwidth to 9X Music but I will have the team evaluate and get back to you. Launch on [Dish Network's internet streaming platform] IPTV would be more likely and we will also analyze that option." Def.'s 24 (3/29/11 e-mail from Kuelling to Plaintiff). On April 7, 2011, Plaintiff wrote an e-mail to Kuelling telling him that the responsibility of launching 9X on Dish Network was "the last thread that is keeping me employed in this company especially after the derogatory and discriminatory comments made by Vikas [Arora] on behalf of Dish Network to the entire team at Saavn." Def.'s Ex. 72. Six days later, Plaintiff informed Kuelling that the proposed license fee for 9X on satellite was $3.50 per

subscriber, and Kuelling responded, "We will need to pass on this opportunity. That is far too expensive for us to consider." Def's 24 (4/13/11 e-mails between Plaintiff and Kuelling).

Although Kuelling declined Plaintiff's offer for Dish Network's satellite platform, in May 2011, Kuelling offered to place 9X on IPTV for no license fee and 50% of attributable share in a Music Pack on IPTV. Def.'s Ex. 71 (e-mail chain ending 5/12/11). Plaintiff and SAAVN rejected the offer. Pl. Counter 56.1 ¶ 189. Afterwards, Plaintiff continued to work at SAAVN for several years, received at least one salary increase, and resigned in February 2015 to relocate to Texas and work in a different industry. Pl. Counter 56.1 ¶ 161, 163; Kshetrapal Tr. 45:2-19.

On August 11, 2011, Plaintiff filed a complaint with the Department of Labor ("DOL"), and he subsequently brought this action against Defendants on May 16, 2014. Def. Counter 56.1 ¶ 540; Compl., Dkt. 2. On February 27, 2015, the Court granted Defendants' motion to dismiss Plaintiff's claims for violations of the Dodd-Frank Act, tortious interference with contract, and defamation based on the SAAVN call. Opinion and Order, Dkt. 30. Defendant now moves for summary judgment on Plaintiffs' remaining three claims for (1) violations of the Sarbanes-Oxley Act ("SOX") in the form of retaliatory blacklisting, (2) tortious interference with business relations based on the alleged interference with Plaintiff's candidacy at Nimbus, and (3) defamation based on statements Slowikowska allegedly made suggesting that Plaintiff was unethical. Dkt. 83. Plaintiff moves for partial summary judgment on the portion of his SOX claim based on the SAAVN call, and he moves to exclude improper evidence. Dkt. 99, 102. The Court turns to these motions.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine

issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Once the moving party has made an initial showing that no genuine issue of material fact

remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory

allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,

315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotations omitted), but must instead

present specific evidence in support of its contentions that there is a genuine dispute as to

material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual

inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

## ANALYSIS

### I.  SOX Claim

Pursuant to Section 1514A of SOX, an employer may not "discharge, demote, suspend,

threaten, harass, or in any other manner discriminate against an employee in the terms and

conditions of employment because of any lawful act" that an employee performs in blowing the

whistle on certain types of fraud. 18 U.S.C. § 1514A. To establish a *prima facie* case of

retaliation under SOX, an employee must "prove by a preponderance of the evidence that (1) she

engaged in protected activity; (2) the employer knew that she engaged in the protected activity;

(3) she suffered an unfavorable personnel action; and (4) the protected activity was a

contributing factor in the unfavorable action." *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013). If the employee establishes a *prima facie* case, the burden of proof shifts to the employer to prove by clear and convincing evidence that it would have taken the same action absent the protected activity. *See id.*; 49 U.S.C. § 42121(b)(2)(B)(iv).

Defendants concede for purposes of this motion that Plaintiff engaged in protected activity by reporting concerns about Dreamakers' invoices and by testifying in the Dreamakers Lawsuit. Def.'s Mem. in Supp., Dkt. 84, at 8 n.2. Plaintiff argues that Defendants blacklisted him in retaliation for this protected activity.

"Blacklisting occurs when an individual or a group of individuals acting in concert disseminates damaging information that affirmatively prevents another person from finding employment." *Barlow v. United States*, 51 Fed. Cl. 380, 395 (Fed. Cl. 2002) (quotation omitted). "To prove blacklisting, a complainant must show evidence that a specific act of blacklisting occurred. Subjective feelings on the part of a complainant toward an employer's action are insufficient to establish that any actual blacklisting took place." *Pittman v. Siemans AG*, 2007 DOLSOX LEXIS 56, at *10 (ALJ July 26, 2007) (internal citation omitted).[1]

Plaintiff identifies four potential acts of blacklisting: (1) the formulation of Dish Network's policy of avoiding doing business with Plaintiff (the "Avoidance Policy"); (2) Arora's communication of the Avoidance Policy to SAAVN during the SAAVN call; (3) Dish Network's alleged interference with Nimbus's decision on whether to hire Plaintiff; and (4) Slowikowska's alleged smears and communication of the Avoidance Policy throughout the industry, which may

---

[1] As in the previous order, the Court affords *Skidmore* deference to DOL regulations and administrative decisions interpreting Section 1514A. *See* Opinion and Order, Dkt. 30 at 6 n.2; *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 220 (2d Cir. 2014).

have caused Plaintiff's rejection from Star TV, among other possible rejections. Pl.'s Mem. in Opp'n, Dkt. 107, at 14. The Court addresses each of these contentions in turn.

## A. Formulation of the Avoidance Policy

In his interview in the DOL proceedings and in his deposition testimony, Kuelling confirmed that, when he took over the department, he formulated a policy to "steer clear" of doing business with companies that employed Plaintiff. Kuelling DOL Tr. 101:20–102:4; 1/13/16 Kuelling Tr. 58:10–59:3. He testified that this Avoidance Policy also applied to companies that employed West, as his "goal was to establish distance and separation from those two that were very involved in the whole Dreamakers situation." 1/13/16 Kuelling Tr. 121:6-13. He testified that he was motivated by a desire "to restore the reputation and have a very reputable, respected group in the industry" and also "to avoid any questions internally at DISH as to why I would establish business relationships and also with those who had been directly involved." *Id.* 51:1-12.

Although avoiding doing business with such companies was his "strong preference" and "general rule," Kuelling testified that "there could be circumstances that warrant that." *Id.* 50:14-19; 56:1-6. Specifically, he testified that each situation "had some sort of factual analysis to it as to how involved they were or were not" in each transaction. *Id.* 121:9-13. For example, "if [Plaintiff] worked in a completely separate division of SAAVN and had nothing to do with online advertising and our online ad agency was placing a DISH ad with SAAVN, my concern is not that great." *Id.* 121:20-25. In his declaration, Kuelling explained that another consideration was whether "one of them could offer a channel or service that could not be obtained through an alternative relationship and would provide overriding value to DISH," in which case he "would consider the proposal on the merits." Kuelling Decl. ¶ 15. Kuelling testified that it was for this

reason he "was willing to have some discussions" with Plaintiff on 9X, but he ultimately declined the proposal because, as he summarized his thoughts: "we already have two Hindi music channels. I don't see it as a good candidate as taking up bandwidth on satellite, because I'm not going to get enough subscribers to offset my cost on this, but I will put you on IPTV." Kuelling DOL Tr. 104:1-11, 71:24–72:8.

Kuelling testified that he communicated the Avoidance Policy to Arora and Slowikowska around the time that SAAVN sought to establish an advertising relationship with Dish Network. *Id.* 62:5–63:20. He testified that he had no knowledge of Plaintiff's protected activity at the time. 1/13/16 Kuelling Tr. 50:8-13, 69:1-12. He further testified that, as a result of the Avoidance Policy, he also declined to work with West as an intermediary on at least one occasion. 1/13/16 Kuelling Tr. 54:2-8.

Plaintiff disputes Kuelling's account, and contends that Defendants adopted the Avoidance Policy in retaliation for Plaintiff's protected activity. He suggests that Slowikowska convinced Kuelling to formulate this policy in February 2011 to prevent Dish Network from working with SAAVN and to legitimize her alleged prior communications to programmers throughout the industry. *See* Pl.'s Mem. in Opp'n, Dkt. 107, at 20; Pl.'s Mem. in Supp., Dkt. 100, at 17 n.4. He suggests that either Kuelling, the ultimate decisionmaker, knew of Plaintiff's protected activity or, even if he did not know, Slowikowska knew and "poisoned" Kuelling's decision. *See* Pl.'s Mem. in Supp., Dkt. 100, at 16 n.3; *Lockheed Martin Corp. v. A.R.B.*, 717 F.3d 1121, 1137 (10th Cir. 2013) (applying "subordinate bias" theory in SOX case).

Plaintiff points to no testimony suggesting that Kuelling knew of Plaintiff's protected activity or that Slowikowska influenced Kuelling's decision to adopt the Avoidance Policy. Instead, he speculates that this must be the case for various reasons including: (i) Hankins met

with Kuelling in Fall of 2010 and discussed Plaintiff's complaints about Slowikowska; (ii) Slowikowska gave inconsistent and allegedly false testimony on multiple subjects; (iii) after seeing Plaintiff's 9X proposal, Slowikowska sent an e-mail to Kuelling stating "[w]e are not willing to entertain any channels from [Plaintiff], right?"; (iv) Plaintiff is not similarly situated to West because he was less culpable; (v) Dish Network forgave a $1.6 million obligation, and continued to broadcast two extremely poorly performing channels, by a programmer who bankrolled Patel's bribery; and (vi) the Avoidance Policy was never reduced to writing. *See* Pl.'s Mem. in Supp., Dkt. 100, at 17 n.4, 19-20; Pl.'s Mem. in Opp'n, Dkt. 107 at 20 n.6; Pl. Corrected 56.1 ¶ 494.

The Court is skeptical that a rational trier of fact could infer from this scant evidence that (1) Kuelling either knew about Plaintiff's protected activity or was influenced by someone who was, and (2) the protected activity was a contributing factor to the application of the Avoidance Policy to Plaintiff. Regardless, even if such an inference could be made, Plaintiff fails to establish a *prima facie* case because the mere application of the Avoidance Policy to Plaintiff is not an "unfavorable personnel action," as it did not affect his employment. *See Bechtel*, 710 F.3d at 447.

Although a decision to avoid working with someone may colloquially be considered "blacklisting," such an action does not necessarily fall within the scope of this statutory language. Section 1514A applies only to employers' decisions to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee *in the terms and conditions of employment* because of any lawful act." 18 U.S.C. 1514A(a) (emphasis added). An action must affect a plaintiff's employment to be considered an unfavorable personnel action under Section 1514A. The Supreme Court analyzed similar statutory language in *Burlington*

*Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). There, the Court held that Title VII's anti-retaliation provision is not limited to actions affecting employment because it lacks limiting phrases such as "with respect to his compensation, terms, conditions, or privileges of employment," which appear in Title VII's substantive antidiscrimination provision. 548 U.S. at 62-64. Although the Court also discussed the purpose of deterring retaliation, it concluded that this purpose merely "reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Section 1514A contains the limiting language that the anti-retaliation provision of Title VII lacks. Thus, Section 1514A, like the substantive antidiscrimination provision of Title VII, is limited to discriminatory actions that affect "the terms and conditions of employment." *See* 18 U.S.C. 1514A(a).

Here, the application of the Avoidance Policy to the Plaintiff, as opposed to communicating that policy, did not affect Plaintiff's employment. In fact, Plaintiff's employment likely could only be affected by the existence of the Avoidance Policy if companies employing or potentially employing Plaintiff learned of its existence. Plaintiff has pointed to no evidence suggesting that Dish Network's mere avoidance of doing business with Plaintiff's employers actually affected his employment.

The closest that Plaintiff comes to making this suggestion is contained in his April 7, 2011 e-mail to Kuelling, in which he asserted that the possibility of launching 9X on Dish Network was "the last thread that is keeping me employed in this company." Def.'s Ex. 72. That claim, however, proved demonstrably false, as he remained employed at SAAVN for several years and received at least one raise after Kuelling rejected his proposal. Even if it was the "last thread," by Plaintiff's own admission, that would have been the result of SAAVN

previously learning about the Avoidance Policy from Arora—an action which is distinct from the application of the policy itself. *See Barlow*, 51 Fed. Cl. at 395 ("Blacklisting occurs when an individual or a group of individuals acting in concert *disseminates* damaging information . . . ." (quotation omitted) (emphasis added)). It is simply impossible to conclude whether Plaintiff's employment would have been similarly affected absent Arora's communication. Therefore, the mere application of the Avoidance Policy does not constitute an unfavorable personnel action, and Plaintiff fails to establish a *prima facie* case with regard to this proposed act of blacklisting.

In the alternative, even if Plaintiff did establish a *prima facie* case, Defendants have proven by clear and convincing evidence that Kuelling would have applied the same Avoidance Policy to Plaintiff even in the absence of his protected activity. Kuelling testified that he applied the same policy to West as he did to Plaintiff, as evidenced by the fact that he declined to do business with her on several occasions when she pitched channels to him. Kuelling 1/13/16 Tr. 167:13–175:20. Plaintiff claims that he is not similarly situated to West because he was not as culpable for the Dreamakers situation and Dish Network threatened to sue West for breach of her restrictive covenants. Pl. Corr. 56.1 ¶ 512-22. Nevertheless, it makes perfect sense for Kuelling to avoid doing business with either of them for reputational reasons, considering that both were directly involved in the Patel situation.

Plaintiff seeks to overcome this obstacle by attacking Hankins's investigation, which concluded that Plaintiff exhibited poor judgment by engaging in a clear conflict of interest with Patel, as a "sham." Pl.'s Mem. in Opp'n, Dkt. 107, at 21. Nevertheless, the e-mails speak for themselves and reveal that Plaintiff clearly exhibited poor judgment in handling such a volatile person: he recommended Patel to Dish Network, became romantically involved with her, maintained a friendship with her even though she lied to him and threatened him, defended her

outbursts because of the savings she brought to Dish Network, and caused drama for his department. Therefore, even if the application of the Avoidance Policy is an unfavorable personnel action, any rational trier of fact would conclude from this evidence that Kuelling would have applied the Avoidance Policy to Plaintiff regardless of the protected activity he engaged in.

**B.    Communication of the Avoidance Policy in the SAAVN Call**

Arora's communication of the Avoidance Policy to SAAVN does not constitute an unfavorable personnel action. Even though the act of communicating this policy may have carried a greater risk of affecting Plaintiff's employment, there is no evidence that this communication actually affected his employment at SAAVN. Indeed, Plaintiff's boss at SAAVN testified that he never told Plaintiff that his job was in danger, and any change in job responsibilities that Plaintiff experienced was because of SAAVN's changing business model and geographic focus. P. Singh Tr. 97:8-11, 98:2-17. Moreover, it is undisputed that Plaintiff remained in his position as Senior Vice President for several years, received at least one salary increase, and voluntarily left SAAVN in February 2015 for a job of his own choosing. Def. Counter 56.1 ¶ 507.

Plaintiff asserts, however, that the Administrative Review Board applies a "prophylactic rule" in some blacklisting cases, which considers all improper references that tend to interfere with employment opportunities to be unfavorable personnel actions:

> The fact that Complainant would not have lost an employment opportunity due to Respondent's improper statement should not shield Respondent from liability because its statement "had a tendency to impede and interfere with Complainant's employment opportunities." Effective enforcement of the Act requires a prophylactic rule prohibiting improper references to an employee's protected activity whether or not the employee has suffered damages or loss of employment opportunities as a result.

*Timmons v. CRST Dedicated Services, Inc.*, ALJ No. 2014-STA-009, 2014 WL 5409560, at *3

(ARB Sep. 29, 2014) (quoting *Earwood v. Dart Container Corp*, ALJ No. 1993-STA-016, slip

op. at 3 (Sec'y Dec.7, 1994) (internal citation omitted)). Although the Court notes that Arora did

not make "references to an employee's *protected activity*," the case that Plaintiff cites applies

this rule even to an employer's statement that a former employee was terminated "because he did

not meet company standards," because the ALJ found this statement to be "plainly disparaging

and . . . of the quality that would prevent a reasonable employer from extending an offer of

employment." *Id.* at *1-3. Arora's statement that Plaintiff "left on not the best of terms" likely

is not so disparaging on its own to deter employers from hiring Plaintiff or to convince SAAVN

to take unfavorable actions against Plaintiff. Keep in mind that the discussion was about Dish

Network doing business with SAAVN—not whether SAAVN should continue to employ

Plaintiff. Nevertheless, the revelation that Dish Network did not want to do business with

Plaintiff, generously interpreted, may have "had a tendency to impede and interfere with

[Plaintiff's] employment opportunities." *See id.* at *3. Hence, the Court will assume that the

SAAVN call constitutes an unfavorable personnel action.

Regardless, Plaintiff fails to establish a *prima facie* case regarding the SAAVN call

because no evidence suggests that Plaintiff's protected activity was a contributing factor in

Arora's decision to reveal the Avoidance Policy to SAAVN. Arora likely knew of at least some

of Plaintiff's protected activity, as he assisted Plaintiff in investigating whether Dreamakers

placed the ads they agreed to. But no evidence suggests that Arora had any motive to punish

Plaintiff for his protected activity. Likewise, no evidence suggests that Kuelling harbored any

animus towards Plaintiff because of his protected activity. Only Slowikowska could have such a

motive, as Plaintiff's reporting of Dreamakers and his subsequent testimony in the Dreamakers

Litigation may have embarrassed her and jeopardized her position. Therefore, in order for a trier of fact to find that Plaintiff's protected activity contributed to Arora's disclosure of the Avoidance Policy, it must conclude that Slowikowska either directly instructed Arora to reveal the existence of the Avoidance Policy to SAAVN or that she convinced Kuelling to instruct Arora to do so. These inferences are supported by nothing more than pure speculation.

Arora testified that he was told to "steer away" from working with SAAVN on marketing if it was not "business critical." Arora DOL Tr. 137:13-24. Specifically, he recounted:

> I should have taken the marketing proposal both to Chris [Kuelling] and Izabela [Slowikowska], because there was a red flag in my head. I would have gone there to see—because they were my managers, I would have gone to them to say, "Hey, this is the scenario. Should we or should we not?" and it would come from both of them or one of them. I'm not sure who directly said it. . . . They said that it will be—again, if you want to steer away from it, you steer away from it, but you will have to keep a very close eye on it. . . . And that means that you'll have to audit everything that's coming. If you can, if you need to do it, let's do it. If you don't need to do it, let's steer away from it.

*Id.* 138:10–139:5. When Kuelling was asked whether he discussed with Arora what specific message to convey to SAAVN, he testified that he could not recall: "I don't recall whether I told him, Hey, go deliver this message, or whether I said, Here's my position on agencies who are pitching us that, you know, where [Plaintiff] might be involved. And then he decided, Okay, I interpret that to mean, you, know, we're going to decline to do business." Kuelling 1/13/16 Tr. 189:22–190:1-7. Regardless, no evidence suggests that Slowikowska convinced Kuelling to instruct Arora to convey such a specific message.[2] She also denied giving anyone instructions on what they should say to outside parties about Plaintiff. *See* Slowikowska 11/22/16 Tr. 173:9-12.

---

[2] In addition, Kuelling would have felt no duty to instruct Arora against disclosing the existence of the Avoidance Policy, because it would not be illegal to communicate such a policy unless the communication was motivated in part by an employee's protected activity, and no evidence suggests that Kuelling knew that any decisions involving Slowikowska could have been tinged by animus from Plaintiff's protected activity. *See Pickett v. Tenn. Valley Auth.*, ALJ No. 01-CAA-18, 2003 WL 22855210, at *7 (A.R.B. Nov. 28, 2003) ("[A]n employer is not prohibited from providing a negative reference simply because an employee has filed a whistleblower complaint. To be discriminatory, the communication must be motivated at least in part by the protected activity.")

Plaintiff can point to no evidence that would allow a rational trier of fact to conclude, without resort to speculation, that Slowikowska influenced Arora's decision to disclose the Avoidance Policy to SAAVN. *See Apex Oil. Co. v. DiMauro*, 822 F.2d 246, 256 (2d Cir. 1987) (holding that "inferring that a conversation took place would amount to speculation" where a defendant's notebook contained the name of another defendant, a date, and specific phrases, and plaintiff attempted "to infer from this that Berberich spoke to Oliver on February 1 and agreed to 'demand delivery' and thereby 'press for default'"). As such, Plaintiff cannot show that his protected activity was a contributing factor, and he fails to establish a *prima facie* case in regard to the SAAVN call.

## C.    Interference with Nimbus Decision

Plaintiff contends that Nimbus did not hire him because of Defendants' interference. Defendants contend that Plaintiff failed to timely exhaust his administrative remedies with respect to this alleged interference. To exhaust administrative remedies, a complaint of retaliation under Section 1514A(a) must first be filed with the Secretary of Labor. *See* 18 U.S.C. § 1514A(b)(1)(A). This action must "be commenced not later than 180 days after the date on which the violation occurs, or after the date on which the employee became aware of the violation." 18 U.S.C. § 1514A(b)(2)(D). Failure to comply with this process deprives courts of subject matter jurisdiction. *Feldman-Boland v. Stanley*, ALJ No. 15-cv-6698, 2016 U.S. Dist. LEXIS 90994, at *14 (S.D.N.Y. July 13, 2016).

Defendants contend that because Plaintiff filed his DOL complaint on August 11, 2011, any violations that occurred before February 12, 2011 are time-barred. Plaintiff learned that Nimbus would not move forward with his candidacy on June 22, 2010. Pl. Counter 56.1 ¶ 229. Hence, Defendants argue that Plaintiff's claim relating to his Nimbus candidacy is time-barred.

Plaintiff points out, however, that he did not become "aware of the violation" until after this date. 18 U.S.C. § 1514A(b)(2)(D). To become aware of a violation, an employee must receive "final, definitive and unequivocal notice of an adverse employment decision." *Poli v. Jacobs Eng. Grp., Inc.*, ALJ No. 2011-SOX-027, 2012 DOL Ad. Rev. Bd. LEXIS 81, at *9 (A.R.B. Aug. 31, 2012) (citation omitted). Although Plaintiff knew that Nimbus rejected him and he suspected that Dish Network had interfered with his candidacy, he claims that until the SAAVN call he was not aware that Dish Network was, in fact, willing to communicate to other companies that it would not do business with Plaintiff. Accordingly, the Court will not treat this alleged violation as time-barred.

Nevertheless, Plaintiff's allegation is clearly meritless. The only known conversation between Dish Network and Nimbus concerning Plaintiff's candidacy was the call from D. Singh to Kuelling on May 18, 2010. Although Plaintiff argues that Kuelling gave Plaintiff a negative reference during the call (which is not so) and speculates that he may have hinted (for which there is no basis) that Dish Network would not work with Nimbus if they hired Plaintiff, no evidence supports such a conclusion. Kuelling and D. Singh's recollections of the call were consistent. Both testified that, after D. Singh described the responsibilities of the position, Kuelling gave an honest assessment of the candidates. *See* D. Singh DOL Tr. 19:16–21:3 ("Chris [Kuelling]'s view was that both these guys are decent guys."); 1/13/16 Kuelling Tr. 137:8–141:6.

Plaintiff complains that Kuelling called him "pushy" and "aggressive," but both Kuelling and D. Singh testified that this reference was considered a positive trait in the context of marketing skills. *See* D. Singh DOL Tr. 24:3-9 ("[W]hat Chris [Kuelling] said was that [Plaintiff] is younger. He is aggressive. And therefore, in terms of selling and marketing, he is

aggressive and pushy. *But* he has no business head experience comparable to Venkat." (emphasis added)); 1/13/16 Kuelling Tr. 139:17-22 ("I think you read that as me saying, If you're looking for marketing background and someone who's going to push for you, be an aggressive marketer, and that's the skill you're looking for, [Plaintiff] would fit that."). No evidence suggests that Kuelling was "negative" towards Plaintiff other than accurately suggesting that he may not be the best candidate for this particular position because of his lack of experience managing a channel. He did not say that Nimbus should not consider Plaintiff for any position. In fact, when pressed for negative information, he stated that Nimbus should interview the candidates and decide for themselves. *See* D. Singh DOL Tr. 23:17-21 ("[W]hen I pushed for anything negative, Chris's view was, 'You need to meet these guys yourselves and make up your own mind.'").

Krishnan testified that D. Singh felt "there might be some issue" with Plaintiff, but that was simply his interpretation of Kuelling's unwillingness to provide more details about Plaintiff. *See* Krishnan Tr. 33:15-19 ("[H]is interpretation, what he told me was Venkat the clear preference. [Plaintiff] not willing to talk about it. So there might be some issue."). Moreover, Krishnan testified that he believed that the "issue" might be that Kuelling was generally uncomfortable with former Dish Network employees working for programmers, and he stated that he would feel the same way because former employees could use their insider knowledge as leverage in negotiations. *See id.* 138:21–139:5 ("[I]f one of my executives was to quit me and join a company which was going to be engaged in a commercial negotiation with me, I would not be happy about it, because he knows too much about my systems."). He did not believe the issue was that there was any "personal anger" towards Plaintiff. *Id.* 139:6-19. Given Plaintiff's reputation at Dish Network stemming from the Dreamakers incident, Kuelling certainly could

have disseminated more damaging information, if he intended to prevent Nimbus from hiring Plaintiff.

The only evidence that Plaintiff points to in order to show that Defendants intended to prevent Nimbus from hiring him is testimony from a former Dish Network employee, Sandeep Krishnamurthy. He testified in the DOL proceedings that he was in a meeting with Kuelling and Slowikowska where Slowikowska made "standout critical and negative comments" about Plaintiff when she discovered that Nimbus was considering hiring him. Krishnamurthy DOL Tr. 10:19-24. But Krisnamurthy can no longer independently recall this conversation, and, in any event, all evidence suggests that this conversation occurred after Kuelling had finished the call with D. Singh. *See* Krishnamurthy Tr. 67:8–69:8; 1/13/16 Kuelling Tr. 150:23–151:6. Although Plaintiff points to phone logs showing that other Dish Network employees contacted Nimbus employees during this general time period after Kuelling's call, he points to no evidence suggesting that any of those calls involved his candidacy.

Even if they did, Plaintiff himself is responsible for not obtaining a position at Nimbus. As Krishnan testified, although Plaintiff would have been the only executive in the United States if he were hired, he was never considered for a "country head" position, because only Venkat had the experience to qualify for such a position. *See* Krishnan Tr. 41:2-12 ("[There was no country head position contemplated when Karamjit and [Plaintiff] were being considered. The country head was a default option which came in only when Venkat came in."). Nimbus offered Plaintiff a consultant position, but Plaintiff refused to accept it. Instead, he made a counteroffer full of excessive demands,[3] which Krishnan knew Nimbus could not satisfy. *See id.* 60:14-17

---

[3] Plaintiff had at least five objections which he included in his counteroffer. Nimbus sent a revised, signed. Plaintiff again did not sign, but rather detailed eighteen separate issues. Pl. Counter 56.1 ¶¶ 221-23. The Court observes that this may not have been the best approach to the Nimbus opportunity.

("In fact, when I looked at this, at the points, my first instinct or reaction was this is a hopeless case. This is not going to happen."). Plaintiff suggests that these demands were reasonable because Venkat later testified that Plaintiff was "prescient" in not accepting the offer, but Venkat explained that Plaintiff was prescient only in the sense that NeoSports "ended up losing its rights and essentially exited the American market." Def.'s Counter 56.1 ¶ 459; Venkat Tr. 82:2-10. Therefore, Plaintiff fails to show that Dish Network is responsible for causing an adverse employment action at Nimbus, and he cannot establish a *prima facie* case in this instance.

### D.    General Smears and Star TV

Even though there is no evidence, Plaintiff maintains that "[i]t is not credible that the only two times that Defendants disparaged Plaintiff to third parties was on an audiotaped call to SAAVN and when discouraging Nimbus from hiring him." Pl.'s Mem. in Opp'n, Dkt. 107, at 16. He alleges that a variety of witnesses testified that Dish Network disseminated damaging information about him "throughout the industry." *Id.* at 10. And he alleges that this damaging information cost him a job in at least one instance: "STAR TV, upon learning that Plaintiff had blown the whistle upon Slowikowska, declined to hire Plaintiff." *Id.* at 15.

As Defendants point out, Plaintiff's claim in this regard is not actionable because he fails to show that "a specific act of blacklisting occurred." *See Pittman*, 2007 DOLSOX LEXIS 56, at *10. The witnesses that Plaintiff identifies as having testified that Dish Network disseminated damaging industry throughout the industry demonstrated no firsthand knowledge of any such communications. For example, Krishnamurthy informed the DOL that he heard Slowikowska "allude to" a statement that Dish Network "would not do business with any company that employed [Plaintiff]," but he did not reference specific conversations and he also suggested that Slowikowska made such statements about all former employees—not just Plaintiff.

Krishnamurthy DOL Tr. 19:1-14. Similarly, former Dish Network employee Farrakh Khawaja testified that he heard that Slowikowska made such statements, but only as hearsay from a non-witness. *See* Khawaja Tr. 92:1-8 ("Now, who said that and how that was said, the only recollection that I have of that specific statement or someone saying that was Mohammad Abbas at MoLabs telling me that.").

Plaintiff also treats the testimony of Colonel Hawinder Bindra as a smoking gun. He testified that, while he was at a programmers meeting, the CEO of Sony TV, Rajan Singh, made a comment suggesting that Plaintiff was complicit in obtaining the Mercedes for West because his "girlfriend" was involved. Bindra Tr. 24:10–25:17. Slowikowska, seated at the same table, "gave a little smile" and did not correct him. *Id.* 35:2–36:15. But one does not "disseminate[] damaging information" by smiling. *See Barlow*, 51 Fed. Cl. at 395. As such, Plaintiff fails to identify a specific instance of blacklisting. *See Messer v. John Elway Dodge*, 2007 DOLSOX LEXIS 35, at *81 (ALJ May 31, 2007) ("Complainant's allegations are too vague to establish that any blacklisting or improper refusals to hire took place. Complainant alleges that 'poison ran through AutoNation,' but he has not established that this was the result of any deliberate effort to disseminate damaging information that prevented him from finding employment.").

Even if he had identified specific comments, he has failed to show that those comments ever made their way to Star TV. In fact, Monica Sadhu from Star TV testified that she did not hire Plaintiff because she did not think he was a personal fit, she "thought he was a little unhinged," and all of her conversations with him "became like a conspiracy theory." Sadhu Tr. 83:21–84:13, 89:8-17. Indeed, after reading the e-mails that Plaintiff sent Star TV after finding out that he did not get the job, one can understand why Sadhu received that impression. *See, e.g.*, Sadhu Ex. 12 (12/2/10 e-mail from Plaintiff) ("David has been brainwashed by several people

. . . I guess GOD still wants me to suffer . . . I will have to wait for DIVINE justice I guess."). Here as well, Plaintiff fails to identify a specific unfavorable personnel action tied to Defendants' conduct, and he fails to establish a *prima facie* case. Accordingly, Defendants are entitled to summary judgment on the SOX claim.

## II.  Tortious Interference with Business Relations Claim

Plaintiff claims that Defendants interfered with his prospective business relation with Nimbus. For the reasons explained in the Court's previous order, New Jersey law applies to this claim. *See* Opinion and Order, Dkt. 30, at 11. A plaintiff asserting a claim for tortious interference for business relations must establish: (1) a prospective business relationship; (2) interference done intentionally and with malice; (3) that the interference caused the loss of the prospective gain; and (4) damages. *Skies Satellites, B.V. v. Home2US Communs., Inc.*, 9 F. Supp. 3d 459, 472 (D.N.J. 2014). "For purposes of this tort, malice is defined to mean the harm was inflicted intentionally and without justification or excuse." *Id.* (quotation omitted).

Plaintiff's claim fails because no evidence suggests that Kuelling acted with malice, for the same reasons as stated previously. Nothing in the record suggests that Kuelling's statements were anything other than an honest assessment of the candidates. Further underscoring Kuelling's lack of malice, Krishnamurthy testified that when he was in a meeting with Slowikowska and Kuelling after the call, only Slowikowska made standout critical and negative comments, whereas Krishnamurthy described Kuelling as "neutral" and his attitude as "why should we stop anybody from getting a job?". Krishnamurthy DOL Tr. 10:20-24, 14:3-10. Also, as previously stated, no evidence suggests that anyone else at Dish Network discussed Plaintiff with Nimbus. Finally, if there was any interference with Nimbus, it was Plaintiffs' own

behavior. *See* pp. 8-9, 26 n.3 *supra*. Therefore, Plaintiff fails to establish a *prima facie* case of tortious interference.

## III. Defamation Claim

Lastly, Plaintiff asserts a defamation claim based on Slowikowska's statements regarding Plaintiff. "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012). To state a claim for slander, a plaintiff must demonstrate: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001).

Defendants point out that the statute of limitations for slander is one year. *See* N.Y. C.P.L.R. § 215(3). Plaintiff concedes that the parties in this case entered into a tolling agreement on October 14, 2011 and that any defamatory statements made prior to October 14, 2010 are time-barred. Pl. Mem. in Opp'n, Dkt. 107, at 11. Given this limitation, Plaintiff clarifies in his opposition brief that the only statements he is challenging are statements from Slowikowska to Arora in early 2011, prior to the SAAVN call. *Id.* He alleges that Slowikowska made defamatory statements when she told Arora that if Dish Network placed ads with SAAVN, an "extra layer of audit" would be required. *Id.* at 12.

Plaintiff cannot show, however, that the statement that an "extra layer of audit" would be required is false. Even if the Court considers the challenged statement to be the implication that Plaintiff acted unethically, Plaintiff cannot show that this implication is false. The investigation and e-mails prove that Plaintiff acted with poor judgment. In fact, Plaintiff admitted in his

deposition testimony that his decision not to report Patel's threatening e-mails to Compliance

was his "biggest mistake" and not "good business judgment." Pl. Tr. 551:23–552:4. Even if

Slowikowska exaggerated Plaintiff's culpability by referring to his conduct as "unethical" rather

than "in poor judgment," this is mere hyperbole or a matter of opinion, and not false. *See*

*Joseph v. Joseph*, 107 A.D.3d 441, 442 (N.Y. App. Div. 1st Dep't 2013) (finding that

"expressions of opinion" and "hyperbole" are "absolutely protected" and are not actionable as

defamatory statements). Thus, Plaintiff's defamation claim also fails.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED,

Plaintiff's motion for partial summary judgment is DENIED, and Plaintiff's motion to exclude

improper evidence is DENIED AS MOOT.[4] The Clerk of Court is directed to enter judgment in

favor of Defendants and close this case.


Dated:  New York, New York
       March 23, 2018

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[4] In granting summary judgment to Defendants, the Court has not relied on any of the allegedly improper evidence identified in Plaintiff's motion. See Pl.'s Mem. in Supp. of Mot. to Exclude, Dkt. 103, at 1.